**COMMODITY FUTURES TRADING COMMISSION, Plaintiff,**

v.

**PROBBER INTERNATIONAL EQUITIES CORPORATION et al., Defendants.**

**Howard SCHNEIDER, Receiver, Petitioner,**

v.

**Abraham ZION, Felix Shiffman, Respondents.**

**No. 79 Civ. 0560 (PNL).**

United States District Court, S. D. New York.

Jan. 8, 1981.

Jane S. Solomon, New York City, for Howard Schneider.

Casey, Lane & Mittendorf, New York City, Robert H. Chester, Clifton, N. J., for Shiffman.

## OPINION AND ORDER

LEVAL, District Judge.

This is an action by the Receiver of Probber International Equities Corporation ("PIE") seeking a determination that certain properties also claimed by respondent Dr. Felix Shiffman are lawfully assets of PIE's estate.

I find that the Respondent Shiffman has established convincingly his right to the properties in question and direct that they be turned over to him.

The facts are as follows.

PIE which is at the center of the controversy was in December 1978 a commodities futures trading house, registered with the Commodity Futures Trading Commission ("CFTC"). Lloyd Probber owned all of its stock and was its sole officer and director. Probber, who drove a Rolls Royce and lived and dressed expensively, convinced a wealthy investor named Abraham Zion that PIE was a highly profitable venture and an attractive investment opportunity. In fact, as the result of serious irregularities in Probber's financial management, PIE's financial condition was disastrous.

Zion was a wealthy and sophisticated investor who had made a specialty of taking over troubled companies. In early January 1979 Zion obtained and examined PIE's books and records. PIE had been having difficulties with its bank, a midtown branch of Citibank. Zion, who had close relationship with Citibank's Riverdale branch, arranged with Probber's approval for PIE's account to be transferred to the books of the Riverdale branch, where Zion intended to monitor PIE's activities. Zion discovered large shortages in PIE's net capital position and in the segregated accounts PIE was required to maintain for its customers' funds under the governing CFTC rules. It appeared that Probber had withdrawn extensive PIE funds for personal use and unrelated business purposes.

Zion nonetheless continued to be interested in PIE as an investment opportunity.

Zion asked that PIE's accountants (Price, Waterhouse & Co.) and lawyers (Webster & Sheffield) be advised of the apparent deficiencies in PIE's accounts. On January 22 Webster & Sheffield, alarmed by this news, advised that PIE should cease all trading (with the exception of close-outs of positions), which was promptly done. The lawyers also advised that the situation would soon have to be reported to the CFTC.

Price Waterhouse inspected PIE's records the next day January 23. It advised Webster & Sheffield that the segregated accounts were short $160,000 and that the net capital of the firm was below CFTC requirements.

Probber gave assurances that the deficiencies would be promptly cured and went that evening to visit his friend Dr. Felix Shiffman.

Shiffman, a surgeon, was a social friend of Probber as well as a customer of PIE and had treated Probber as a doctor. Probber told Shiffman that PIE had earned a $2 million commission in Israel which would be received any day. Probber also told him that a substantial investor was going to invest in PIE, which would result in a large profit for Probber. He said the investor intended to act promptly but wanted PIE to show a more substantial capital. Probber asked Shiffman if he could lend cash or securities for a very short time, a month at the most. The securities could be placed in

a safe deposit box under Shiffman's exclusive control and could be withdrawn by Shiffman at any time. He said that he would be rolling in money as the result of the new investment and would pay Shiffman a fee of 10% of the money or securities advanced. Probber said the investor had suggested that Probber obtain loans for a short time from friends to avoid the delays involved in negotiating with a bank.

Shiffman told Probber he did have such property and might be willing to do what Probber suggested provided Shiffman would be in sole control and could remove the property whenever he wished. Probber told Shiffman he would need to come open the safe deposit boxes in order to show the securities to PIE's accountant.

Shiffman meanwhile called his sister and a friend for advice. They warned him not to do this, saying that it sounded irregular, and warned that he, and probably others, might be defrauded. The friend advised him not to be an officer of the corporation. Shiffman then called Probber and asked for assurance that Shiffman would be doing nothing wrong in advancing the funds. Probber gave him assurance and emphasized that it was the investor, Zion, who had suggested the transaction and knew all about it. Probber told Shiffman he would not be an officer but would be named Financial Administrator of PIE, having sole access to the safe boxes.

The next morning Wednesday January 24, 1979, Shiffman took Probber to the Chemical Bank at 72nd Street and Columbus Ave., where Shiffman kept property in safe deposit boxes. Four new boxes were rented in the name of PIE, with corporate resolution forms showing that Felix Shiffman, Financial Administrator, would have sole access. Shiffman paid the rental fee and obtained assurance from the bank officer that he alone would have access. In the boxes Shiffman placed his property consisting of municipal bearer bonds in the face amount of $396,000, cash in the amount of $49,400 and a collection of gold coins thought to be worth about $30,000.

Later that day Probber called Shiffman and asked him to come back to the bank to allow PIE's accountant to observe the contents of the boxes. Shiffman went to the bank where he was joined by Probber and Gary Hirsch, an accountant employed by Price Waterhouse.

Outside Shiffman's presence and unknown to him, Probber had told Hirsch on the way to the bank that the contents of the boxes were Probber's own property which he was contributing to the corporation to cure the deficiencies. Probber explained Shiffman's presence by saying that he was a financial administrator of PIE.

In the presence of Probber and Shiffman, Hirsch inventoried the contents of the boxes. When the cash was found to come to slightly less than Shiffman had thought, Shiffman took $400 from his pocket and added it to the box.

After returning to his office, Hirsch called Bernard Carrey, PIE's lawyer at Webster & Sheffield to report what he had seen. Carrey then called the CFTC and arranged for a meeting the following morning. That evening Price Waterhouse advised Probber that the bonds and the coin collection would have to be converted into cash in order to satisfy PIE's deficiencies under the CFTC regulations. Probber authorized Carrey to represent to the CFTC that the bonds were being sold.

Probber then told Zion that he had borrowed, and did not own, the contents of the boxes. Zion advised Probber, in view of the urgent need for cash to satisfy CFTC requirements, to use the securities as collateral to borrow from Zion's Citibank branch in Riverdale.

The next day Thursday January 25, Probber called Shiffman and told him the property was not in the proper form and needed to be taken to another bank. Shiffman balked and demanded an explanation. Probber said he would bring Shiffman, with the property, to meet Zion the investor who would explain everything. Shiffman, clad in his surgery scrubs, went to Chemical where he removed the contents of the boxes into an airline flight bag, with which he

accompanied Probber to Zion's house in Riverdale.

Zion soon became aware that Shiffman had no understanding of what was happening, either because Probber had lied to him, or from lack of sophistication or both. He took Shiffman and Probber to Citibank, where the $49,800 was deposited into a new account designated PIE "Segregated Account/Trading Account on Behalf of Customer" with Shiffman as the sole signatory. The bearer bonds were placed in a newly rented similarly denominated safe box, again with Shiffman having sole signature and access. The gold coins, which could neither be sold rapidly nor used as loan collateral, were of no value in solving PIE's problems. They were returned to Shiffman and were placed in a separate box rented in Shiffman's name. Shiffman was assured by Zion and bank personnel that he alone had the power to make withdrawals of any of this property.

Probber signed a note of PIE in Shiffman's favor which he dated January 15. Zion suggested that Probber collateralize it by his own stock in PIE. Shiffman, having left patients unattended, left the bank hurriedly while the bonds were being inventoried.

Pursuant to discussions with Zion, Citibank was prepared to lend PIE $250,000, secured by Shiffman's bonds, if Zion acquired control of PIE. It issued a letter of commitment to that effect on January 26, but this never came to pass, in part because Zion never took a position in PIE.

Meanwhile on January 25, representatives of PIE, Webster & Sheffield and Price Waterhouse went to meet with the regional counsel and other officers of the CFTC. Carrey advised the CFTC of the deficiencies and of the cash and securities which had been placed in PIE's safe boxes at Chemical, which Carrey believed to be property contributed by Probber. (There was no mention of the coins.) Carrey stated it was Probber's intention to liquidate the securities promptly and to deposit the cash and the proceeds to cure the deficiencies in the segregated customer accounts.

The CFTC instructed that PIE should do no further business (other than the closing out of customers' positions). It was assured that business had already been terminated. Also the CFTC instructed PIE to arrange for verification of its representations and submit financial statements.

That afternoon Zion went to meet with Probber, Webster & Sheffield and Price Waterhouse. Shiffman was not present. At this meeting it was revealed to Webster & Sheffield and Price Waterhouse that the representations they had made that morning to the CFTC were false: that the safe deposit box property did not belong to Probber, and the bonds were not being sold, and that the cash had not been put into a PIE account.

Zion stated that he would not invest in PIE unless Webster & Sheffield and Price Waterhouse found PIE to be in satisfactory condition and it received a clear bill of health from the CFTC. Financial statements were prepared that night for the CFTC, one version showing a large receivable owed by Probber to PIE (representing the funds which Probber had improperly withdrawn from the company's accounts), and a second version, *pro forma*, assuming payment by Probber of that receivable. These financial statements did not include the Shiffman property.

The next day Zion and PIE representatives met with the CFTC and advised that the information given the previous day had been false and that the safe box property belonged, not to Probber, but to an unsophisticated Dr. Shiffman who had been lied to by Probber.

A plan was presented to the CFTC (without Shiffman's knowledge) calling for Shiffman's lending his property to Probber, Probber using it as collateral to secure a loan for Citibank arranged by Zion, and all of this being dependent on Zion receiving from the CFTC satisfactory assurances as to PIE.

The CFTC, however, indicated it might seek an injunction against future violations, a condition not acceptable to Zion because it would have PIE operating under a cloud.

The next day, Saturday, January 27, Shiffman, at Probber's request, attended a meeting at PIE's offices. It was at this meeting that Shiffman learned for the first time of PIE's difficulties with the CFTC and of its bad financial condition, all of which had been concealed from him by Probber.

Shiffman said he wanted to remove his property from the accounts at Citibank, but Zion warned that he would not be able to because the CFTC would obtain a restraining order. Zion warned furthermore that even if Shiffman succeeded initially in getting the property out, he and the money would be tied up by the CFTC in litigation. Zion suggested that the safest way to avoid trouble was to pursue Zion's plan by which Shiffman's property would secure Citibank loans to PIE, and Zion and Shiffman would hold the stock of PIE, this plan being contingent on PIE emerging with a clean slate at the CFTC.

In the meantime, advice had been sought from a lawyer—one Hecht—who was thought to have CFTC experience. A meeting was held in his office on Sunday January 28. Although it was not clear at first whom the lawyer represented, he appears to have selected Shiffman as his client upon learning that Shiffman had liquid assets. Hecht began drafting papers and documents designed to carry out the Zion plan. Some of these documents were signed in anticipation although the plan (and the documents) never became effective. On Monday, Hecht, Carrey and a representative of Price Waterhouse went to the CFTC to tell its officials of the contemplated arrangements.

On Tuesday January 30, Zion met with Carrey and former Mayor John V. Lindsay, since become a partner of Webster & Sheffield. Lindsay advised Zion that he would be a fool to get involved in PIE, especially in view of the uncertainty as to the extent of its liabilities—Lindsay's advice being probably the first and perhaps the only sensible words spoken throughout this bizarre scenario. Zion was convinced, and told Hecht later that day that he would not participate.

Carrey became incensed when Hecht called him to discuss PIE's problems and failed to reveal until the end of the conversation that he was talking from the CFTC offices and in the presence of its officials. Webster & Sheffield promptly dropped PIE as its client.

Shiffman meanwhile told Zion he would go to Citibank to withdraw his property. Probber authorized the release of Shiffman's property. Zion, apparently worried that he might be in some trouble with the CFTC if Shiffman withdrew his property, asked the Citibank manager to confirm with the bank's attorneys whether it was proper for the bank to release Shiffman's property in spite of the likelihood of litigation being brought by the CFTC. The manager Richtmyer checked with the bank's attorneys who authorized the release to Shiffman. Zion, still worried, advised Citibank not to release Shiffman's property, despite which Citibank allowed Shiffman to make the withdrawal. He did so on Wednesday January 31.

But Shiffman, a true glutton for punishment, told Zion that if the removal of the property risked to embarrass him, he would leave it in Zion's custody. Accordingly, Zion placed the cash and bonds in a custody account in his own name at Citibank. The collection of gold coins remained at Citibank in a safe box in Shiffman's name.

Meanwhile the CFTC's accountant completed his audit of PIE on January 31 and confirmed that PIE was undercapitalized. The next day February 1, 1979 the CFTC instituted an action and obtained the appointment of a temporary Receiver for PIE. The CFTC complaint and supporting accountants' affidavit did not reflect any of the Shiffman property as being among the assets of PIE. The Receiver instituted proceedings against Zion for the turnover of the Shiffman property. Shiffman intervened, asserting his claim. Eventually upon consent of Shiffman, Zion turned the property over to the Receiver for safekeeping to await the resolution of the dispute.

\* \* \*

■ Although Shiffman seeks the remedy of rescission of his loan to PIE he does not require it. For at the time of the institution of this action all of his property had been returned to him and was in his possession. On January 24 Shiffman had made a short term loan of his property to PIE. The gold coins were returned to him at the Citibank the following day. Regardless what was the status of the bonds and the cash while they were deposited in a "Segregated Account/Trading Account on Behalf of Customer" at Citibank from January 25 to January 31, there is no question that on January 31 they were withdrawn from these PIE accounts at Citibank and returned to Shiffman pursuant to Probber's authorization and Shiffman's demand. The fact that Shiffman thereafter left his property initially with Zion to avoid the possibility of embarrassment to Zion, and thereafter authorized it to be transferred to the Receiver to await adjudication of rights (as a show of good faith), does not affect Shiffman's lawful possession of the property. Zion and the Receiver have held the property merely as escrow agents for Shiffman awaiting this court's determination of rights. Shiffman's entrusting of the property to them implied no waiver on his part of the benefits of ownership or possession as against PIE.

■ Therefore Shiffman is not obligated to show entitlement to rescission in order to recover possession of the property which was already returned to him. To the contrary it is the Receiver who must show some equitable right to set aside PIE's return to Shiffman of the property it borrowed from him.

■ Even if the foregoing were not the case, and Shiffman were required to establish his right to the remedy of rescission in order to recover his property, I would find that he was entitled to such remedy by reason of the frauds which induced him to make loans to PIE.

The proof shows beyond reasonable doubt that Shiffman was defrauded by Probber and PIE. When Probber approached Shiffman for a loan, PIE was in deep trouble, with serious deficiencies in its customer segregated accounts and in its required capital, resulting in large part from Probber's defalcations. It had ceased doing business, and its predicament was about to be reported by its lawyers to the CFTC. Not only did Probber fail to advise Shiffman of these critical facts, but he affirmatively misrepresented the situation by drawing a picture of a thriving lucrative business about to receive a huge capital infusion from an eager investor and a $2 million commission. The money would be so plentiful that Probber would happily pay his friend a 10% fee. Further aspects of the fraud were Probber's representation to Shiffman that the loaned funds were to be shown on a full disclosure basis to Zion, the investor who had requested Probber to obtain such a loan, whereas in fact Probber intended to use the funds to deceive the CFTC, his lawyers and his accountants. More significantly, Probber concealed from Shiffman that he intended to describe the property as his own contribution to the capital of PIE, rather than Shiffman's loan.

That these misrepresentations were material and that Shiffman relied on them scarcely needs be stated. The Receiver's contention that Shiffman advanced the money in spite of the risks by reason of the fat 10% fee offered is not convincing. I am satisfied that Shiffman believed that the fee reflected generosity on the part of his friend and the great benefit Probber was to obtain from the transaction rather than any risk inherent in it. Shiffman was totally unaware of the risks involved in the fraudulent aspects of Probber's plan, and would not have proceeded if he had been aware of them.

■ The Receiver's contentions that Shiffman was somehow involved in Probber's fraud are unconvincing and depend in part on sleight-of-hand in the presentation of the facts. Because Shiffman's property was the subject of Probber's deceitful representations to PIE's accountants and attorneys and ultimately to the CFTC, the Receiver seeks to characterize Shiffman's furnishing of the property as an act of deceit.

What was deceitful was not PIE's acquisition of Shiffman's property; it was Probber's false representations concerning the ownership of that property. If Probber had correctly described the property as a short term loan from Shiffman, no fraud of any kind would have been committed. Of course, a truthful description would not have bailed Probber out of his difficulties. If the property was borrowed, it could not count towards PIE's equity capital requirements, and if Shiffman retained his informal possessory "mortgage" over his loaned property, these assets could not have satisfied the rules for segregated customer accounts. Seeking to solve his difficulties, Probber lied about the ownership of the property and about the terms under which it had come into PIE's possession saying it was his property which he was contributing to the capital of PIE. That was the fraud—not Shiffman's advance of the loan. There is absolutely no showing that Shiffman was in any way privy to Probber's misrepresentations. Shiffman, having been used by Probber in the commission of Probber's fraud, was no more a party to it than were Price Waterhouse and Webster & Sheffield who were used by Probber to give the fraudulent message to the CFTC. All of these, Shiffman, Price Waterhouse and Webster & Sheffield, were pawns in Probber's fraud—Shiffman knowing the true facts but not knowing how Probber was falsely describing them; the accountants and lawyers knowing and transmitting Probber's false representations, but unaware of the true facts. It is clear that none of these became culpable participants in Probber's fraud by virtue of his use of them to accomplish it.

■ The only piece of evidence which gives momentary pause as to Shiffman is the fact that, on meeting Hirsch, the young Price Waterhouse accountant, at the Chemical vault and upon being asked by him whether he knew the CFTC regulations, Shiffman answered that he did not but could learn them. It is argued that in this remark Shiffman was seeking to mischaracterize himself as an official of PIE and was thus helping Probber accomplish the fraud.

Although it is true this response was strange, I do not find in it support for the Receiver's contention. At that time, having loaned his property to PIE under an arrangement which gave to him sole access under the title "Financial Administrator", Shiffman apparently felt he may be required in some way to act as an administrator. I find the remark was made in good faith and was not an attempt to deceive Hirsch. He did not disguise the fact that he knew nothing at the time about CFTC regulations.

I conclude that Shiffman has shown beyond reasonable doubt that he was defrauded by Probber and was not himself in any way a participant in the frauds practiced by Probber on the accountants, lawyers and the CFTC.

Therefore, even if Shiffman had not recovered his property in January, he would be entitled to an order of rescission by reason of PIE's fraud. *See Goldsmith v. National Container Corp.*, 287 N.Y. 438, 442–43, 40 N.E.2d 242 (1942); 12 *Williston on Contracts* § 1523 at 606–07 (3rd ed.)

The Receiver makes several arguments in an attempt to show both that Shiffman could not lawfully obtain the return of his property from PIE in January of 1979 and that if he could not or did not obtain such return, a rescission remedy is not now available. He contends first that any return of Shiffman's property by PIE was a "fraudulent conveyance" void under the New York Debtor and Creditor law ("DCL").

■ This argument is without merit. Transfers of property are deemed fraudulent as to creditors and are voidable as a matter of law "without regard to . . . actual intent" if they are made *without "fair consideration"* and the party making the transfer is insolvent or is rendered insolvent thereby. DCL § 273. See also DCL §§ 274, 275. "Fair consideration" is defined by DCL § 272 to include the circumstance "[w]hen in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied . . . ."

The Receiver's first contention as to this theory is that there was no "antecedent debt" owed by PIE to Shiffman because Shiffman's loan had been to Probber personally and not to PIE. Accordingly it contends that PIE's transfer to Shiffman was to pay off Probber's antecedent debt rather than its own. As there is no real dispute that PIE either was insolvent at the time of the transfer or was rendered insolvent by it, the Receiver contends that the transfer is "fraudulent as to creditors" under § 273.

■ This analysis is not supported by the evidence which shows that Shiffman loaned his property to PIE and not to Probber personally. Once again the Receiver confuses the fraudulent actions of Probber with the actions of Shiffman. The fact that Probber told Price Waterhouse and Webster & Sheffield, fraudulently and out of Shiffman's presence, that it was he Probber who had put the assets in the company did not make these assertions either true, or binding on the unsuspecting Shiffman. The Receiver's brief argues "Probber needed this triangular arrangement because it is the only method, outside of a direct capital contribution to PIE by Shiffman, through which the CFTC requirements could have been met . . . . Assets offset by a corresponding liability would not have solved PIE's regulatory problem." This overlooks that Probber had available to him the simple tool of lying when the facts did not suit his convenience. It is true that with the hindsight provided by the Receiver's brief, Probber could have arranged matters in such a way that he would have needed to lie only to Shiffman, and would not have had to lie to Price Waterhouse and Webster & Sheffield as well. But that is not the way the transaction was arranged. And since Probber had little reluctance to lie, the additional lie cost him little. The arrangements between Probber and Shiffman took the form of Shiffman's loan to PIE. This was reflected in the note of Probber International Equities Corp. signed by Probber as "President". [Exhibit II].

The Receiver also seeks to rely on Shiffman's testimony describing his conversations with third persons in which references were made to lending property to Lloyd Probber. The Receiver seeks to draw from those remarks a significance which they will not bear. It is commonplace, even among fastidious bankers in informal colloquial conversation—as opposed to specifying formally the articulation of the terms of a business deal, to identify one's borrower by the name of the president or principal of a borrowing corporation. I find that Shiffman's use of this familiar locution did not mean that his loan was personal. The loan was to the corporation.

Since Shiffman's loan was to PIE, PIE's repayment was in satisfaction of an antecedent debt and was therefore, assuming good faith, made for fair consideration under the terms of § 272.

■ Next the Receiver contends that the requirement of "good faith", assumed above, was not satisfied. For reasons discussed at length above, the Receiver's contention fails as to Shiffman. He had no reason to believe that Probber failed to book and reveal the appropriate liability to Shiffman reflecting the loan of those assets. And there was no reason, legal, equitable or otherwise why he should not have retaken his property when it became available to him. Nor was good faith lacking on Probber's part (or PIE's) in the return of Shiffman's property. Probber had contracted on behalf of PIE for a demand loan. It would have been bad faith on his part, and PIE's, to prevent Shiffman from retaking his property. The return of Shiffman's property was perhaps the only instance in this record of good faith conduct by Probber.

■ Furthermore, addressing the reasons underlying the fraudulent conveyance statutes, it would be unfair and arbitrary in this instance if Shiffman were to lose his property to the Receiver for the benefit of creditors of PIE. There is no creditor of PIE who extended credit relying in any way on the belief that Shiffman's property was part of PIE's asset pool. At the time Shiffman made the loan, PIE had already

ceased accepting new orders and accounts; on the advice of its lawyers PIE had ceased all business except the close out of existing positions. The addition of Shiffman's property to PIE's assets would represent a windfall and unjust enrichment to the creditors, whose plight (like Shiffman's) was attributable to their having placed unwarranted trust in Probber—not in Shiffman. Shiffman and his property were completely unknown to them.

■ The Receiver next argues that Shiffman is estopped from either recovering his property or claiming rescission because he was involved in a scheme to mislead a federal regulatory agency as to the assets of a regulated entity. *See, e. g., D'Oench, Duhme & Co. v. F.D.I.C.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956, *reh. denied*, 315 U.S. 830, 62 S.Ct. 910, 86 L.Ed. 1224 (1942); *Deitrick v. Greaney*, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694, *reh. denied*, 309 U.S. 697, 60 S.Ct. 611, 84 L.Ed. 1036 (1940); *Matter of Weis Securities, Inc.*, 605 F.2d 590 (2 Cir. 1978), *cert. denied*, sub nom. *Grossmann v. Redington*, 439 U.S. 1128, 99 S.Ct. 1045, 59 L.Ed.2d 89 (1979); *Mt. Vernon Trust Co. v. Bergoff*, 272 N.Y. 192, 5 N.E.2d 196 (1936). Schneider maintains that Shiffman cannot seek to avoid this authority by contending that he did not know that any misrepresentations were to be made since, in light of the facts which he admits knowing, he should have known the nature of Probber's dealings.

The Receiver has failed to demonstrate that Shiffman had either actual or constructive knowledge of the fraudulent aspects of Probber's plan or that he should have known them.

I note further that Probber's attempt at misleading the CFTC was singularly ineffective. There was no evidence that the CFTC course of action was in any way altered by Probber's initial and short-lived misrepresentations of PIE's position. While at one point in his testimony CFTC counsel Koblenz suggested that he had delayed obtaining permission to bring a suit in light of the representations made to him on January 25, he also testified that it often took time to obtain such approval and that the audit of the CFTC accountant which was ordered as soon as he was notified of PIE's problems was not completed until January 31. Suit was filed on the 1st of February. The CFTC accountant was at no point misled as to the extent of PIE's resources and that they did not include the Shiffman property. Even if there were some minimal delay in CFTC reaction to the PIE deficiencies in light of representations concerning the Shiffman property, it is clear that such delay was without any effect as to the financial well-being of PIE and its customers.

■ Equally unavailing is the Receiver's argument that rescission is not appropriate because instead of acting quickly to withdraw from the wrongfully induced relationship, Shiffman ratified it by the arrangements made on Sunday, January 28. *See New York Telephone Co. v. Jamestown Telephone Corp.*, 282 N.Y. 365, 26 N.E.2d 295 (1940). The Receiver argues that Shiffman cannot claim duress, since there can be no claim of duress where adequate legal remedies are available to redress one's grievance. *See Kohn v. Kenton Assoc., Ltd.*, 27 A.D.2d 709, 280 N.Y.S.2d 520 (1967), *aff'd*, 23 N.Y.2d 726, 296 N.Y.S.2d 369, 244 N.E.2d 60 (1968); *Colonie Construction Corp. v. De Lollo*, 25 A.D.2d 464, 266 N.Y.S.2d 283 (1966), *aff'd*, 20 N.Y.2d 917, 286 N.Y.S.2d 271, 233 N.E.2d 287 (1967); *Oleet v. Pa. Exchange Bank*, 285 A.D. 411, 137 N.Y.S.2d 779 (1955). While arrangements were indeed contemplated which might have led to ratification precluding Shiffman's recovery of his property, these were never consummated. To the extent that documents were signed which appeared to reflect a loan from Shiffman to Probber on Sunday January 28, the effectiveness of these arrangements was understood to be contingent upon conditions subsequent which were never satisfied. There was no ratification by Shiffman.

There is therefore no bar to Shiffman's invocation of his rescission remedy should it be required. I repeat however that no such remedy need be invoked since Shiffman's

property had been returned to him by PIE prior to the commencement of this lawsuit and it was entrusted by him to the receiver for safekeeping pending the outcome of the dispute.

The Receiver's claim of entitlement to the Shiffman property is denied. Shiffman's claim is granted, and the Receiver is accordingly directed to turn over the Shiffman assets to him.

Submit judgment on notice.