## In re FRANK SANTORA EQUIPMENT CORP., Santora Crane Service, Inc., Debtor.

## Allan B. Mendelsohn, Chapter 7 Trustee of the Estate of Frank Santora Crane Service, Inc., Plaintiffs,

v.

## National Westminster Bank, U.S.A., Defendants.

Bankruptcy Nos. 892–83119–478, 892–82118–478.

Adversary No. 895–8773–478.

United States Bankruptcy Court, E.D. New York.

Dec. 7, 2000.

See also 231 B.R. 486.

Pitoni, Bonchonsky & Zaino, LLP (By M. John Pitoni), Garden City, NY, for Defendant.

Zeichner, Ellman & Krause, LLP (By Peter Janovsky), New York City, for Trustee.

**Decision Granting Summary Judgment in Favor of Plaintiff on Preference and Fraudulent Conveyance Causes of Action and Denying Defendant's Cross-Motion for Summary Judgment**

DOROTHY EISENBERG, Bankruptcy Judge.

On or about June 3, 1992 (the "Filing Date"), Frank Santora Equipment Corp. ("FSEC") and the related entity known as Santora Crane Service, Inc. ("Crane"), sometimes referred to collectively as the "Debtors," filed petitions for relief under Chapter 11 of the Bankruptcy Code. On or about October 21, 1993, the Debtors' cases were converted to Chapter 7 of the Bank-

ruptcy Code, and Allan B. Mendelsohn was appointed as Trustee. The Trustee, as Plaintiff, timely commenced an adversary proceeding in December 1995 against National Westminster Bank, USA ("NatWest" or the "Defendant"), pursuant to 11 U.S.C. §§ 547 and 550, seeking to avoid certain alleged preferential payments made by FSEC to NatWest. The complaint was amended on two separate occasions, most recently by Second Amended Complaint dated February 18, 2000. The Second Amended Complaint seeks a judgment, pursuant to 11 U.S.C. §§ 544 and 550(a) and New York Debtor and Creditor Law ("DCL") §§ 273, 273–a, 274 and/or 275, avoiding and setting aside $87,874.10 in pre-petition transfers by FSEC to NatWest as fraudulent conveyances and providing for the recovery of said sum, together with interest; or, alternatively, judgment, pursuant to 11 U.S.C. §§ 547(b) and 550(a), avoiding and setting aside as preferences transfers totaling $87,874.10 made within one year of the Filing Date by FSEC to NatWest for the benefit of Frank Santora, Jr. ("Santora"), the sole shareholder and an insider of FSEC, and providing for the recovery of said sum, together with interest from the date of each transfer. NatWest has filed an Answer to the Second Amended Complaint, denying the allegations of the complaint and asserting several affirmative defenses, including without limitation, (a) with respect to Trustee's claim that the transfers were preferential, that the transfers were in payment of a debt incurred by the Debtors in the ordinary course of business between the Debtors and NatWest; (b) with respect to the fraudulent conveyance claims, that they are time-barred; (c) that the complaint fails to state a claim upon which relief may be granted; and (d) that the Trustee's claims are barred by the doctrines of laches, waiver and estoppel.

Before the Court is the Trustee's motion for summary judgment (the "Summary Judgment Motion") and a cross-motion for summary judgment filed by NatWest ("NatWest's Cross–Motion"). After consideration of the record and all of the prior proceedings had herein, the Court has determined to grant the Trustee's Summary Judgment Motion and deny NatWest's Cross–Motion. This decision constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52, as made applicable to adversary proceedings by Fed. R. Bankr.P. 7052.

### ISSUES PRESENTED

The issues presented by the Summary Judgment Motion and NatWest's Cross–Motion are as follows:

(1) Whether the fraudulent conveyance claims "relate back" to the filing of the original complaint;

(2) Whether the Statements of Facts Pursuant to LBR 7056–1 filed by the Plaintiff and the Defendant raise any genuine issues of material fact for trial;

(3) Whether the record before the Court shows that the pre-petition transfers made by FSEC to NatWest were fraudulent conveyances;

(4) Whether NatWest is precluded by Fed.R.Civ.P. 37, as made applicable herein by Fed. R. Bankr.P. 7037, from asserting the defense that the pre-petition transfers were rent payments under a certain real property lease, which lease was not produced by NatWest during Plaintiff's attempted discovery; and

(5) Whether the record before the Court shows that the pre-petition transfers within one year of the Filing Date by FSEC to NatWest were preferential transfers, pursuant to Section 547 of the Bankruptcy Code, made for the benefit of Santora, the principal of FSEC, and not for the benefit of FSEC.

### FACTS

On December 22, 1995, the Trustee timely commenced several adversary proceedings seeking to recover as preferential transfers moneys transferred by the Debtors to third parties for the benefit of San-

tora, an insider of the Debtors, during the preference period. For purposes of these adversary proceedings, the Trustee invoked the *Deprizio* doctrine, as originally set forth by the Court of Appeals for the Seventh Circuit in *Levit v. Ingersoll Rand Financial Corp. (In re V.N. Deprizio Construction Co.)* ("*Deprizio* "), 874 F.2d 1186 (7th Cir.1989). In *Deprizio*, the Seventh Circuit held that preferential transfers to a non-insider creditor which benefit insider guarantors by relieving them of their contingent liability to the creditor-transferee are recoverable from the non-insider creditor, even if the transfers occurred between 90 days and one year of the filing; i.e. the "Insider Preference Period".

■ The Bankruptcy Reform Act of 1994 (the "Reform Act"), which was signed into law on October 22, 1994, overrules *Deprizio* and its progeny. The Reform Act amends 11 U.S.C. § 550 so that an avoidable transfer to a non-insider creditor, made during the Insider Preference Period, is not recoverable from the creditor notwithstanding that an insider guarantor may have benefitted. The legislative history that accompanied the bill made clear the Congressional intent to clarify that non-insider transferees should not be subject to the preference provisions beyond the 90 day statutory period. In this case, it is undisputed that NatWest is not an insider of FSEC or Crane and that the transfers which are the subject of the Second Amended Complaint occurred beyond the 90 day statutory period.[1]

The Trustee alleged that the Reform Act Amendments do not apply to the instant bankruptcy case because it was commenced prior to the effective date of the Reform Act, which statute is not retroactive, and that the Court of Appeals for the Second Circuit did not have an opportunity to construe the *Deprizio* holding prior to the Reform Act Amendments.

The Trustee served the Adversary Complaint on NatWest on or about January 8, 1996. Simultaneously with the filing of the instant adversary complaint, the Trustee served Interrogatories and a Document Request on NatWest (the "Initial Discovery"). NatWest responded to the Initial Discovery by answering the Interrogatories and producing certain documents (the "Initial Discovery Responses"). NatWest served an Answer to the Complaint on or about February 20, 1996.

Subsequent to filing the answer, NatWest moved (a) to dismiss the Complaint because, among other things, the transfers at issue were made between 90 days and one year prior to the Filing Date; i.e., during the Insider Preference Period, and, therefore, recovery could not be had against NatWest, which is a non-insider creditor, since *Deprizio* was not controlling in the Second Circuit before the effective date of the Reform Act; or, alternatively, (b) for a more definite statement (the "Dismissal Motion"). By Order dated October 23, 1996 (the "Order Denying Dismissal Motion"), the Court denied the Dismissal Motion and directed the Trustee to serve an amended complaint (the "First Amended Complaint") containing a more definite statement of the factual allegations against NatWest.

On or about November 25, 1996, the Trustee served the First Amended Complaint, seeking the avoidance and recovery of $87,874.10 in alleged preferences paid by FSEC to NatWest in the year prior to the Filing Date (the "NatWest Transfers"). The NatWest Transfers consist of eight (8) transactions during the period June 10, 1991 to January 10, 1992 which are evidenced by the checks and bank statements annexed to the Summary Judgment Motion as Exhibit B (the "Checks and Bank Statements"). NatWest filed an Answer to the First Amended Complaint.

---

1. Eight (8) transfers form the basis of the Trustee's preference claim pursuant 11 U.S.C. §§ 547(b) and 550(a). They occurred between June 10, 1991 and January 10, 1992, more than 90 days and less than one year before the Filing Date. Consequently, all eight (8) transfers occurred during the Insider Preference Period.

In the meantime, NatWest had filed a notice of appeal with respect to the Order Denying Dismissal Motion and a motion for leave to appeal (the "Appeal") with the United States District Court for the Eastern District of New York. The District Court granted the motion for leave to appeal as to the questions of whether the Complaint was time-barred and whether the *Deprizio* doctrine applies in the Second Circuit. However, the Appeal was dismissed by Order dated February 13, 1998 for NatWest's failure to prosecute the appeal. Notwithstanding the dismissal of the NatWest Appeal, the District Court decided the two questions at issue in NatWest's Appeal by deciding a similar related case. *See Mendelsohn v. Sequa Financial Corp. (In re Frank Santora Equipment Corp.)*, 231 B.R. 486 (E.D.N.Y. 1999). In *Sequa*, the District Court held that (1) the *Deprizio* doctrine, pursuant to which a trustee may commence a preference avoidance proceeding against a non-insider creditor to avoid a transfer which was made more than 90 days, but less than one year, pre-petition, if the transfer was made for benefit of an inside guarantor of the debtor's obligations, would be adopted and applied in a bankruptcy case which was filed prior to the effective date of the statute effectively overruling *Deprizio*, *Sequa*, at 490, and (2) the two-year statute of limitations on preference avoidance claims began to run anew from date of appointment of the permanent Chapter 7 trustee, after conversion from a Chapter 11 case in which no trustee was appointed, *id.*, at 493. The District Court's holding in *Sequa* regarding the applicability of the *Deprizio* doctrine is *res judicata* in this adversary proceeding.

Following the dismissal of NatWest's Appeal, in or about April 1998, the Trustee served upon NatWest's counsel additional document requests, interrogatories and notices of deposition (collectively, the "Additional Discovery Request"). One of the Interrogatories posed to NatWest required NatWest to identify all Collateral securing the Obligations of the Debtors, their agents, managers and representatives, to NatWest.[2] NatWest did not identify as Collateral securing the Obligations of the Debtors a real property lease between Frank Santora, Jr., as landlord, and FSEC, as tenant, or an assignment by Frank Santora, Jr. to NatWest of Santora's right to collect rent from FSEC for property owned by Santora, personally, and occupied by FSEC as tenant (more fully discussed *infra* p. 8). In fact, NatWest defaulted in responding to the Additional Discovery Request.

On July 23, 1998, NatWest moved the District Court to reinstate its Appeal and for a stay of the proceedings before this Court (the "Discovery Stay Motion"). On September 1, 1998, prior to the District

---

**2.** Interrogatory 6 states: "Identify any Collateral securing the Obligations, other than the Collateral in 1–5 above (the 'Other Collateral')." "Collateral" is defined as "any and all assets of the Debtors that secured the Obligations." Pltiff's Amended Second Set of Interrogatories, Definition 11. "Obligations" is defined as "any and all obligations owed by the Debtors to the Defendant." Pltiff's Amended Second Set of Interrogatories, Definition 6. "Debtors" are defined as "Frank Santora Equipment Corp. and/or Santora Crane Service, Inc. and any agents, managers, attorneys, consultants or representatives of any kind of Frank Santora Equipment Corp. and/or Santora Crane Service, Inc." Pltiff's Amended Second Set of Interrogatories, Definition 5. Interrogatory 13 states: "Identify the documents or other exhibits that the defendant expects to offer at trial." "Document" is defined as "the originals (or any copy when originals are not available) and any other non-identical copies (whether different from the originals because of notes made on such copies or otherwise) or writings of every kind and description, ... and including but not limited to, ... agreements ... in the actual or constructive possession, custody or control of defendants." Pltiff's Amended Second Set of Interrogatories, Definition 17. "Agreements" are defined as "any and all agreements pertaining to the Obligations, including, without limitation, all loan documents, agreements, notes, mortgages, security agreements, correspondence and/or guaranties." Pltiff's Amended Second Set of Interrogatories, Definition 7.

Court's decision, the Trustee moved this Court to compel NatWest to comply with the Discovery Request (the "Motion to Compel") and NatWest filed opposition thereto, whereupon this Court entered an Order dated November 3, 1998 (the "Discovery Order"), directing that, in the event the District Court denied the Discovery Stay Motion, then NatWest must comply with the Additional Discovery Request by November 13, 1998. Since the District Court denied the Discovery Stay Motion at a hearing held October 23, 1998,[3] NatWest responded to the Additional Discovery Request, among other things, by making certain documents (the "Additional Discovery Responses") available to the Trustee.

The Initial Discovery Responses and the Additional Discovery Responses evidenced loans from NatWest to FSEC in the amounts of $600,000 and $800,000 and repayment of such loans by the debiting of FSEC's bank account at NatWest. However, none of the Discovery Responses included information as to the NatWest Transfers (i.e., the Checks and Bank Statements) or a copy of the real property lease between Frank Santora, Jr., as landlord, and FSEC, as tenant, or an assignment by Frank Santora, Jr. of his right to collect rent to NatWest (more fully discussed *infra* p. 364).

On or about October 28, 1999, the Trustee filed the Summary Judgment Motion, by which he also sought leave to again amend the complaint. On January 11, 2000, the Court (a) granted the portion of the motion seeking to amend the complaint to add the fraudulent conveyance causes of action; (b) directed the Trustee to file and serve the Second Amended Complaint; and (c) directed NatWest to file and serve an Answer to the Second Amended Complaint. The facts supporting the fraudulent conveyance claims are virtually identical to the facts initially plead by the Trustee in connection with the preference claim. The Summary Judgment Motion and NatWest's subsequent Cross–Motion were then adjourned, with an opportunity for further submission of documents and/or evidence.

As exhibits to NatWest's Cross–Motion, dated November 30, 1999, NatWest produced *for the first time* to the Trustee (1) a net lease dated January 1, 1987 (the "Lease") between Frank Santora, Jr., as landlord, and FSEC, as tenant, with respect to the commercial premises owned by Santora (the "Premises"). The lease was for a term commencing January 1, 1987 and ending December 31, 1992, at an annual rental of $120,000 (Cross–Motion, Exh. C); and (2) the Assignment of Lessor's Interest in Lease (the "Assignment of Lease"), dated November 6, 1987, whereby Santora allegedly assigned his interest in the Lease to NatWest for the purpose of securing the payment due to NatWest from Santora of (a) a mortgage note, dated July 26, 1984, in the amount of $205,705.04, and (b) a mortgage note, dated November 6, 1987, executed by Santora in favor of NatWest, in the additional principal amount of $619,294.96 (Cross–Motion, Exh. D).[4] The Lease and the Assignment of Lease were "Other Collateral" for purposes of the Trustee's request for Additional Discovery. As indicated at the January 11, 2000 hearing with respect to the Summary Judgment Motion and NatWest's Cross–Motion, counsel to NatWest became aware of the existence of the Lease and the Assignment of Lease in approximately January 1999, ten months prior to actually producing those docu-

3. The District Court also denied NatWest's application to reinstate the appeal. *In re Frank Santora Equipment Corp.*, 227 B.R. 206 (E.D.N.Y.1998).

4. By Supplemental Mortgage Extension and Modification Agreement, dated as of November 6, 1987, Santora granted NatWest a mortgage on the Premises in the total principal amount of $825,000, as security for (a) the note dated July 2, 1984, the balance of which was $205,705.04 on the date the mortgage was granted, and (b) the note dated November 6, 1987 in the principal amount of $619,294.96.

ments. By failing to produce the Lease and the Assignment of Lease when their relevance became known, NatWest ignored the General Instructions contained in the Trustee's Additional Discovery Request[5] and violated Fed. R. Bankr.P. 7026(e).

The pre-petition Obligations of the Debtors and/or Santora, individually, to NatWest consisted of three (3) loans, as follows:

(a) A $600,000 loan to FSEC, guaranteed by Crane, payable in monthly installments of $5,000 each ("Loan 1"). These monthly payments were made by automatic withdrawals from the FSEC accounts maintained at NatWest. As of the Filing Date, the outstanding balance due on Loan 1 was approximately $377,000 (Governale 11/29/99 Aff., ¶¶ 7, 11).

(b) A $800,000 loan to FSEC, guaranteed by Crane, payable in monthly installments of $13,333.33 ("Loan 2"). These monthly payments were made by automatic withdrawals from the FSEC accounts maintained at NatWest. As of the Filing Date, the outstanding balance due on Loan 2 was approximately $619,000 (Governale 11/29/99 Aff., ¶¶ 7, 11).

(c) A $825,000 loan to Santora, individually, secured by a mortgage granted by Santora in favor of NatWest (the "Nat-

West Mortgage") on the Premises occupied by FSEC under the Lease dated January 1, 1987 ("Loan 3"). *See supra* note 4. The payments due under Santora's personal obligation to NatWest were made by monthly checks drawn, not on any NatWest account, but on FSEC's account at Manufacturers Hanover Trust Company. These transfers by FSEC to NatWest are obviously mortgage payments because (i) they were paid to NatWest on a regular basis, as each check is dated the 10th of the month, except for one which was dated on the 12th of the month;[6] (ii) each check indicates the Santora mortgage account number (04613485); (iii) each check was endorsed on the back with the same account number; and (iv) the payments were in varying amounts (e.g., $11,231.15 on 6/10/91, $10,970.11 on 7/10/91, $11,134.79 on 8/10/91, $11,086.63 on 9/10/91, $10,830.23 on 10/10/91, $10,990.27 on 11/12/91, $10,737.00 on 12/10/91 and $10,893.92 on 1/10/92). The varying amounts of the monthly payments indicate that they were mortgage payments (consisting of a fixed amount representing repayment of principal and a varying amount representing interest)[7] and not rent payments under a net lease, which are usually in a fixed amount.

As indicated above, the Lease provides for an annual rental of $120,000, or $10,000

---

5. General Instruction 2 provides: "Please take notice that the obligation to produce the documents requested herein is intended to be of a continuing nature so that, if any time after compliance with this request you come into possession of any document falling within the scope of this Request for Production of Documents, you should furnish such document or documents within ten (10) days of their receipt." Pltiff's Amended Set of Interrogatories, at 11.

6. The Supplemental Mortgage Extension and Modification Agreement dated November 6, 1987 by and between NatWest and Santora provides that payments of principal and interest are due on the first day of each month and that a late charge will be imposed if received more than fifteen (15) days after the due date (NatWest Mortgage ¶ 2 at 4).

7. The NatWest Mortgage provides that *Santora* shall pay to NatWest "[c]ommencing on January 1, 1988 and on the first day of each month thereafter up to and including November 1, 1992, the sum of $4,853.93 on account of the Principal Sum" (NatWest Mortgage, ¶ (iii) at 2). The NatWest Mortgage further provides for payment by Santora to NatWest "[c]ommencing on January 1, 1988 and on the first day of each month thereafter up to and including December 1, 1992, interest on the unpaid portion of the Principal Sum calculated from December 1, 1987 at the per annum rate equal to 12.205 percent ... calculated for the actual number of days elapsed based upon a 360 day year" (NatWest Mortgage, ¶ (ii) at 2). Consequently, interest payable would vary from month to month based on the unpaid principal amount and the number of days in the month.

per month. Although NatWest argues that the NatWest Transfers were attributable to monthly Lease payments made by FSEC directly to NatWest pursuant to the provisions of the Assignment of Lease, the books and records of FSEC reflect that, during the year prior to the Filing Date, FSEC made numerous $10,000 payments to Santora-at least one each month (12/23/99 Declaration in Opposition to NatWest's Cross–Motion, Exh. G). Because these payments are each in exactly the amount payable under the Lease, they are more likely to be Lease payments than are the NatWest Transfers. Moreover, NatWest has not produced a scintilla of evidence that would support its argument that the monthly payments received from FSEC from June 1991 through January 1992, each bearing the account number of the Santora mortgage, were attributable to FSEC's monthly obligation to Santora under the Lease.[8] Consequently, the Court finds that the NatWest Transfers were made by FSEC to satisfy Santora's personal obligation under the mortgage, without any consideration to FSEC.

Santora, the sole shareholder of FSEC, was incarcerated subsequent to the Filing Date, and, at a hearing held on April 25, 2000, NatWest's counsel represented to the Court that Santora is unavailable to testify as a witness in this proceeding. (*See also* Pittoni 1/4/00 Aff., ¶ 16). NatWest's counsel did not attempt to subpoena Santora to obtain documentary evidence or to obtain his deposition. There are no other witnesses with personal knowledge regarding these transactions, except John Governale, a former loan officer at NatWest who was responsible for Loans 1, 2 and 3, who has made his affidavit available to the Court in opposition to the Summary Judgment Motion and in support of NatWest's Cross–Motion (the "Governale Affidavit"). Governale does not state in his affidavit that Santora or anyone else told him in 1991 (at the time of the NatWest Transfers) that the NatWest Transfers were intended to be rent payments under the Lease, which were assigned to NatWest, nor does he produce any letter, memorandum or other document from NatWest's files to make the connection between the Lease and the NatWest Transfers. His affidavit is based solely on his own speculations and conclusions based on the existence of the Lease and the NatWest Mortgage. Neither does Governale mention or explain the monthly payments of $10,000 per month from FSEC to Santora during the year prior to the Filing Date. Plainly, these cancelled checks (12/23/99 Declaration in Opposition to NatWest's Cross–Motion, Exh. G), each in the exact amount of the monthly rent, are more likely to be the rent payments than are the checks evidencing the NatWest Transfers (Summary Judgment Motion, Exh. B), each of which bears the NatWest Mortgage account number.

As of the Filing Date, the New York City Department of Finance had a priority unsecured claim against FSEC in the amount of $15,766.00, for nonpayment of Commercial Rent/Occupancy Tax for the period June 1, 1987–May 31, 1988 and for the period June 1,1989–June3, 1992, and for non-payment of N.Y.C. General Corporation Tax for the period January 1, 1989–December 31,1991, as evidenced by its proof of claim filed in FSEC's bankruptcy case on September 23, 1992, which was assigned Claim No. 30. A portion of that claim is also evidenced by a tax warrant in the amount of $4,975 which was filed by the Commissioner of Finance in the office of the Queens County Clerk on or about August 20, 1990, pre-petition. According to the records of the Queens County Clerk, the tax warrant remains unsatisfied (Summary Judgment Motion, Exh. D). Consequently, pursuant to 11 U.S.C. § 544(b), the Trustee steps into the shoes of an unpaid judgment lien creditor and may

---

**8.** Although the Assignment of Lease might have been relevant had there been a default by Santora under the mortgage, thereby triggering NatWest's right to collect rents directly from FSEC, NatWest makes no allegation of such a default.

avoid pre-petition fraudulent conveyances of FSEC's property pursuant to applicable state law.

BDO Seidman, LLP ("BDO"), the Trustee's accountants, have examined the available books and records of the Debtor. On the basis of these books and records, the accountants have prepared an adjusted FSEC Balance Sheet for December 31, 1990 and an adjusted FSEC Balance Sheet for May 31, 1992. Based on the accountants' analysis and the adjusted balance sheets, the assets and liabilities and stockholders' deficit of FSEC at fair value were as follows:

| | 12/31/90 | 5/31/92 |
| --- | --- | --- |
| Assets | $ 3,594,425 | $ 1,020,503 |
| Liabilities | 11,614,454 | 11,869,042 |
| Stockholders' deficit | ($ 8,020,029) | ($10,849,042) |

The stockholders' deficits of FSEC as of December 31, 1990 and May 31, 1992 indicate that the sum of its liabilities was greater than its assets as of those dates. According to William K. Lenhart, C.P.A. ("Lenhart"), a partner at BDO, there is a possibility that the stockholders' deficit would be even larger if adjusted for possible income tax liabilities, liabilities relating to related parties or executory contracts or other contingent liabilities, and unrecorded increases in allowances for doubtful accounts, which are not reflected in the books and records examined by BDO (Lenhart 9/17/99 Aff., ¶ 11). There is no credible evidence to dispute the calculations done by BDO, except for a self-serving, unsupported and conclusory statement that FSEC was solvent on those dates contained in the Governale Affidavit (Governale 11/29/99 Aff., ¶ 17). In view of the uncontroverted evidence, the Court finds that FSEC was insolvent as of December 31, 1990 and May 31, 1992.

NatWest has raised no genuine issues of material fact requiring a trial on the merits and has not offered as a witness any party with personal knowledge of the financial affairs of the Debtors or the course of dealing which occurred between the Debtors and Santora, individually, during the one year period preceding the Filing Date.

## DISCUSSION

### I. The Fraudulent Conveyance Claims Relate Back to the Filing of the Original Complaint and Therefore the Pleading May be Amended

■ Fed. R. Bankr.P. 7015 expressly makes Fed.R.Civ.P. 15 applicable to adversary proceedings. Fed.R.Civ.P. 15(a) sets forth the standard for the amendment of pleadings. The second sentence of that rule states that after issue has been joined "a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed. R.Civ.P. 15(a). Courts have consistently held that refusal to grant leave, absent justifying reasons, constitutes an abuse of discretion. *United States v. Hougham,* 364 U.S. 310, 81 S.Ct. 13, 5 L.Ed.2d 8 (1960); *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

■ Rule 15(c)(2) further permits relation back of the amended complaint to the date of the original complaint when the claim asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading. Fed. R.Civ.P. 15(c). Here, the Second Amended Complaint must relate back to the Amended Complaint or else the fraudulent conveyance claims would be barred by the two year statute of limitations. The transactions sued upon between the Trustee and NatWest are one and the same under either 11 U.S.C. § 547 (preferences) and 11 U.S.C. §§ 544(b)(1) and 550 and DCL §§ 273 et seq. (fraudulent conveyances), and NatWest is in the same position to defend whether it be a preference claim or a fraudulent conveyance claim, especially since NatWest has not been precluded from offering the Lease as evidence in this proceeding.

In view of the fact that the Court has found that the Second Amended Complaint relates back to the Amended Complaint, the fraudulent conveyance claims are not barred by the two-year statute of limitations.

## II. NatWest is Not Precluded From Asserting the "Lease Defense"

Fed.R.Civ.P. 26 is expressly made applicable to adversary proceedings by Fed. R. Bankr.P. 7026. Fed.R.Civ.P. 26(a) contains mandatory disclosure requirements regarding disclosure of witnesses and documents that are relevant to disputed facts alleged with particularity in the pleadings, and Fed.R.Civ.P. 26(e)(1) contains a duty to supplement disclosures under Fed.R.Civ.P. 26(a) if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other party during the discovery process or in writing. Fed.R.Civ.P. 37(c) provides that, if a party fails to fulfill the requirements of Fed.R.Civ.P. 26(a) and 26(e)(1) "without substantial justification," that party may not use testimony from that witness or the undisclosed information as evidence at trial, at a hearing, or in connection with a motion, "unless the failure to disclose was harmless." Fed. R.Civ.P. 37(c)(1). There must be a violation of Fed.R.Civ.P. 26(a) or 26(e)(1) in order for there to be a preclusion sanction. In lieu of a preclusion sanction, the Court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. Fed. R. Bankr.P. 37(c)(1). Here, NatWest has violated Fed. R.Civ.P. 26(a) and 26(e)(1) by failing to make disclosure of the Lease for almost one year after its significance came to counsel's attention by John Governale. Thus, the Lease and the testimony with respect thereto contained in the Governale Affidavit would be precluded unless NatWest can show "substantial justification" for failing to disclose and that such failure to disclose was harmless. *See, e.g. Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 680 (D.Kan.1995) (the burden of establishing substantial justification and harmlessness is upon the party who is claimed to have failed to make the required disclosure).

"Substantial justification" requires justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request. *Hinton v. Patnaude*, 162 F.R.D. 435, 439–40 (N.D.N.Y.1995) (holding that plaintiff's untimely submission of reports and affidavits from expert witnesses not previously disclosed was substantially justified because plaintiff's counsel had suspended further trial preparation pending settlement talks). The proponent's position must have a reasonable basis in law and fact. *Id.* The test is satisfied if there exists a genuine dispute concerning compliance requirements. *Id.* A party may be substantially justified in not disclosing evidence if the party could not have been expected to foresee its relevance or if there were unforeseeable developments during trial. *Sterling v. Interlake Industries, Inc.*, 154 F.R.D. 579, 587 (E.D.N.Y. 1994).

Sanctions may not be imposed if the failure to disclose information under Fed.R.Civ.P. 26 was harmless. While the motive or culpability of the violating party may have some bearing on a determination of harmlessness, the more significant factor is whether the omission caused the other party to suffer prejudice and, if so, whether the ill effects of the nondisclosure can be remedied by ordering supplemental production of information and by requiring the breaching part to reimburse its opponent for all the expenses, including attorneys' fees, caused by the breach. *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 679 (D.Kan. 1995).

The courts within the Second Circuit have rarely imposed such a drastic sanction as evidence preclusion, since they

are reluctant to exclude evidence pertaining to the merits of the case. As a result, the courts within this Circuit require that a party's conduct constitute "flagrant bad faith and callous disregard" of the Federal Rules of Civil Procedure. *Hinton v. Patnaude,* 162 F.R.D. 435 (N.D.N.Y.1995); *McNerney v. Archer Daniels Midland Co.,* 164 F.R.D. 584 (W.D.N.Y.1995); *Sterling v. Interlake Industries, Inc.,* 154 F.R.D. 579 (E.D.N.Y.1994).

Here, as in *Hinton,* it is especially significant that the Lease was produced in opposition of the Trustee's Summary Judgment Motion. While the Court is mindful that counsel's explanation of why he had not produced the Lease earlier—because he believed that it would be discovered as part of the deposition of John Governale, which he proposed that the Trustee's counsel conduct—is unpersuasive, the Court is also aware that a party opposing summary judgment is entitled to have the Court consider all of its defenses. By permitting the Trustee to amend his complaint at this juncture to include fraudulent conveyance claims and then to preclude introduction of the Lease and Governale's testimony relative thereto as a defense to the element of "fair consideration," would be prejudicial to NatWest.

In addition, there is a genuine dispute as to whether the relevance of the Lease could have been ascertained prior to the amendment of the complaint to include the fraudulent conveyance claims. That would appear to provide substantial justification for the failure by NatWest to disclose the Lease earlier in these proceedings, though the Lease is certainly also a component of NatWest's defense to the preference claim (i.e., that the debt was incurred by FSEC in the ordinary course of business or financial affairs of FSEC and NatWest). In any event, the failure to disclose was harmless, as the Trustee has not been prejudiced by the Court's consideration of the Lease in connection with the Summary Judgment Motion and NatWest's Cross–Motion, as the Lease, together with other relevant evidence establishes that the NatWest Transfers were not rent payments due under the Lease, but were mortgage payments made by FSEC on behalf of Santora.

### Defenses of Laches, Waiver and Estoppel are Unavailable to NatWest

Natwest asserts the defenses of laches, waiver and estoppel in its Answer to Second Amended Complaint. For the following reasons, the Court finds these defenses to be unavailable to NatWest:

■■■■■■■ Laches is an equitable doctrine which bars the assertion of a claim because of an unreasonable delay by a party which prejudices the other party. *In re Coffee Cupboard, Inc.,* 118 B.R. 197, 200 (Bankr. E.D.N.Y.1990). An equitable action is barred by laches under New York law where the following exist: (1) proof of delay in asserting a claim despite the opportunity to do so; (2) lack of knowledge on the defendant's part that a claim would be asserted; and (3) prejudice to the defendant by the allowance of the claim. *Rapf v. Suffolk County of New York,* 755 F.2d 282, 292 (2d Cir.1985). In order to show that he has been prejudiced, a defendant must show reliance and change of position resulting from the delay. *Rapf,* 755 F.2d at 292.

■■■■■ In this case, as NatWest itself points out, it was not immediately apparent to the Trustee that the eight (8) checks evidencing the NatWest Transfers, which were presented in the amended complaint out of chronological order, were actually payments made at approximately the same time every month for eight (8) consecutive months (Memo of Law in Opposition to Trustee's Summary Judgment Motion, at 4). NatWest's counsel first brought this to the Trustee's attention at his deposition and asserted that, since the eight (8) transfers at issue were made on or about the 10th day of the month, they were not preferential payments but, rather, payments made in the ordinary course of business between FSEC and NatWest (Memo

of Law in Opposition to Trustee's Summary Judgment Motion, at 4). When Trustee's counsel requested additional information about these transfers by letter dated February 12, 1999 (Summary Judgment Motion, Exh. M), NatWest's counsel responded by letter dated February 26, 1999 that, according to Governale, the transfers were not payments from FSEC or Crane but, were payments by Santora personally on a separate loan made by NatWest to Santora (Summary Judgment Motion, Exh. N). Consequently, the first intimation that the NatWest Transfers could be fraudulent conveyances came in February 1999 from NatWest's response. Consequently, the Trustee did not have an opportunity to assert the fraudulent conveyance claims until that time and was not responsible for the delay in doing so. Moreover, as discussed above, the fraudulent conveyance claims arise out of the same nucleus of facts that form the basis of the Trustee's preference claim and, therefore, should not come as a surprise to NatWest. In short, the Trustee has merely decided to proceed on alternate theories based on the same facts. Consequently, NatWest has not been prejudiced by the assertion of the fraudulent conveyance claims. Furthermore, NatWest has not demonstrated reliance and a change of position resulting from the delay, as required by *Rapf.*

In view of the foregoing, the defense of laches is unavailable to NatWest in this adversary proceeding.

■ NatWest also asserts the defenses of waiver and estoppel. The doctrine of equitable estoppel precludes a party at law and in equity from denying or asserting the contrary of any material fact which he has induced another to believe and to act on a particular manner. *Sterling v. Interlake Industries Inc.,* 154 F.R.D. 579, 584 (E.D.N.Y.1994). The elements of equitable estoppel as to the party being estopped are: (1) an act constituting a concealment of facts or a false misrepresentation; (2) an intention or expectation that such acts will be relied upon; (3) actual or constructive knowledge of the true facts by the wrongdoer; (4) reliance upon the misrepresentations which causes the innocent party to change its position to its substantial detriment. *Id.* There does not have to be an actual attempt to mislead. It is sufficient that the party being estopped knew or had reason to believe that their acts or inaction might prejudice the party asserting the estoppel. *Id.,* at 585.

■ Here, NatWest alleges that the Trustee feigned ignorance of the fact that the NatWest Transfers were made regularly on or about the 10th day of each month commencing on June 10, 1991 and continuing through January 10, 1992, and that his intentional concealment of this fact prejudiced NatWest, since NatWest was unable to ascertain that the NatWest Transfers were attributable to what it claims were Lease payments. However, NatWest's mere allegations do not prove its theory. The Court cannot find from the evidence before it that (i) the Trustee understood the significance of the regularity of the NatWest Transfers before receipt of the February 26, 1999 letter from NatWest's counsel, indicating that these transfers represented payments of a personal loan to Santora, or (ii) the Trustee's conduct was meant to mislead NatWest. In fact, the Court cannot find from the record that the Trustee knew or had reason to know prior to February 1999 that the NatWest Transfers could have represented payments under the Lease or the NatWest Mortgage, since neither of those documents had been produced by NatWest in response to discovery requests. Consequently, the Trustee is not estopped from utilizing the regular intervals of these payments in establishing his fraudulent conveyance claims against NatWest.

■ A waiver is the voluntary and intentional relinquishment or abandonment of a known existing legal right, advantage, benefit, claim or privilege, which except for

such waiver the party would have enjoyed. *In re Kizelnik,* 190 B.R. 171, 179 (Bankr. S.D.N.Y.1995); *Nassau Trust Co. v. Montrose Concrete Prods. Corp.,* 56 N.Y.2d 175, 184, 451 N.Y.S.2d 663, 668, 436 N.E.2d 1265 (N.Y.1982) (waiver is the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable). The essential elements of the equitable doctrine of waiver are (1) an existing right, benefit or advantage; (2) actual or constructive knowledge of the existence of such right, benefit or advantage; and (3) an actual intention to relinquish it or an adequate substitute for such intention. *Kizelnik,* at 179. As discussed above, until February 1999 the Trustee did not have knowledge of the existence of fraudulent conveyance claims against Nat-West. Although NatWest argues that the Trustee's decision not to depose Governale, the only person at NatWest with actual knowledge of the transactions at issue, is somehow evidence of a waiver, clearly, the Trustee took no affirmative act—nor did he intend—to waive his right to assert the fraudulent conveyance claims. The Trustee merely believed that the documentary evidence was sufficient to sustain his claims. Accordingly, the Trustee did not waive his right to assert the fraudulent conveyance claims.

### III. Summary Judgment is Appropriate When There Are No Genuine Issues of Fact in Dispute

Pursuant to Fed.R.Civ.P. 56, as made applicable to adversary proceedings by Fed. R. Bankr.P. 7056, the Court shall grant summary judgment when there are "no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party moving for summary judgment is required to demonstrate that there is an absence of evidence which supports the non-movant's case. *Id.,* at 325, 106 S.Ct. at 2553. Fed. R.Civ.P. 56 further provides that a party

opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleadings, but the non-moving party's response must set forth specific facts showing that there are genuine issues for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All inferences as to the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). As Rule 56(e) specifically states, a "party may not rest upon the mere allegations or denials of [an] adverse party's pleading, but ... must set forth concrete particulars," and bring to the Court's attention some affirmative indication that their version of relevant events is not a meritless allegation. *See SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978).

In this case, there are no genuine issues of material fact to be determined at trial. NatWest's Statement Pursuant to LBR 7056–1 alleges that the Lease and the Assignment of Lease demonstrate that NatWest Transfers were made by FSEC as rent payments, in consideration for which FSEC was permitted to occupy the Premises owned by Santora. However, the Court notes that NatWest has not claimed that there was a default under the Santora mortgage that would trigger Nat-West's ability to collect rents directly from FSEC pursuant to paragraph 6 of the Assignment of Lease. Moreover, the checks evidencing the NatWest Transfer clearly identify the transfers as mortgage payments, since they bear the Santora mortgage account number. In addition, the eight payments vary in amount, which indicate that they are not payments under

a net lease [9] but, rather, payments under a mortgage.[10] Finally, the documents speak for themselves, are not in any way ambiguous, and do not need to be supplemented by parol evidence.

Notably, NatWest has not explained the eight (8) checks in the amount of $10,000 each, payable to Santora, drawn monthly during the period June 1991 to January 1992 on FSEC's account at NatWest (12/23/99 Declaration in Opposition to Nat-West's Cross–Motion, Exh. G), and which appear to be the actual rent payments under the Lease, except to state that their existence is "confusing at best" (Pittoni 1/4/00 Aff., ¶ 17).

In view of the foregoing, NatWest has not met its burden under Fed. R. Civ. 56 and Fed. R. Bankr.7056; consequently, this matter is ripe for summary judgment.

## IV. The Trustee Can Avoid the Nat-West Transfers as Fraudulent Conveyances Pursuant to 11 U.S.C. § 544(b) and Both DCL §§ 273 and 273–a

■ Pursuant to Section 541(b)(1) of the Bankruptcy Code, "the trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title...." 11 U.S.C. § 544(b)(1). In this case, as of the Filing Date, the New York City Department of Finance ("NYC") had a priority unsecured claim against FSEC for unpaid taxes in the amount of $15,766.00, as evidenced by the proof of claim filed in FSEC's bankruptcy case, which was assigned Claim No. 30. NYC also filed with the Queens County Clerk on August 20, 1990 tax warrants representing a portion of that claim, which remained unpaid as of the commencement

of FSEC's Chapter 11 case. Accordingly, the debtor-in-possession had the rights and powers of NYC to avoid the NatWest Transfers as of the Filing Date, and the Trustee, as successor in interest to the debtor-in-possession obtained the same rights and powers upon his appointment as Chapter 7 Trustee.

■ The Trustee argues that the NatWest Transfers violate certain provisions of the New York Debtor and Creditor Law ("DCL") and, therefore, are voidable under New York law. Under the DCL, a creditor is permitted to trace a transferor's transactions back over six years. In re Montclair Homes, 200 B.R. 84, 94 (Bankr.E.D.N.Y.1996) (citing Schwonke v. Banister, 83 A.D.2d 752, 443 N.Y.S.2d 513 (1981)). Section 544(b)(1) of the Bankruptcy Code grants to the Trustee an extraordinary power to step into the shoes of unsecured creditors such as NYC and avoid any transfer of a debtor's interest in property that is voidable under the DCL. In re Pappas, 239 B.R. 448, 454 (E.D.N.Y.1999). Thus, the Trustee is not time barred from litigating its fraudulent conveyance claims. If the Trustee can establish that the NatWest Transfers are fraudulent conveyances under New York law, they are voidable and all monies transferred to NatWest from FSEC's account at Manufacturers Hanover Trust Company are funds which the Trustee may recover from NatWest for the benefit of the estate. 11 U.S.C. § 550(a).

■ Section 273 of the New York Debtor and Creditor Law provides that "[e]very conveyance made ... by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made .. without fair consideration." N.Y. Debtor and Creditor Law

---

9. A handwritten provision in the Lease specifically provides: "*Tenant* covenants to pay all expenses with respect to the Premises, including real estate taxes, utilities, water charges, the intention being that this is a net lease" (emphasis supplied).

10. The Mortgage Note and the NatWest Mortgage provide that interest shall be calculated for actual days elapsed based upon a 360–day year; consequently, the amount of the mortgage payment attributable to interest would vary from month to month.

§ 273 (McKinney 1990). This section is founded upon a theory that a transfer by an insolvent is fraudulent irrespective of any actual intent. *Feist v. Druckerman*, 70 F.2d 333 (2d Cir.1934). Transfers of property are deemed fraudulent as to creditors and are voidable as a matter of law, without regard to actual intent, if they are made (1) without fair consideration, and (2) the party making the transfer is insolvent or is rendered insolvent thereby. *Commodity Futures Trading Comm'n v. Probber Intern. Equities Corp.*, 504 F.Supp. 1154 (S.D.N.Y.1981).

■ Section 272 of the New York Debtor and Creditor Law defines "fair consideration" as follows:

> Fair consideration is given for property, or obligation,
>
> a. When in exchange for such property, or obligation, **as a fair equivalent therefor, and in good faith,** property is conveyed or **an antecedent debt is satisfied,** or
>
> b. When such property, or obligation, is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

N.Y. Debtor and Creditor Law § 272 (McKinney 1990) (emphasis supplied). Here, the defendant argues that the eight (8) NatWest Transfers satisfied the fair consideration requirement of DCL § 272 because each transfer represented a rent payment made directly to NatWest by FSEC pursuant to the provisions of (a) the Lease between FSEC and Santora and (b) the Assignment of Lease, and, thus, constituted payment of an antecedent debt of FSEC. As indicated above, the Court has found that the NatWest Transfers were mortgage payments due by Santora personally under the NatWest Mortgage and not rent payments under the Lease. Consequently, NatWest has not established any fair consideration to FSEC for the NatWest Transfers, and the first element of DCL § 273 has been established.

The Court has already found that FSEC was insolvent on December 31, 1990 and May 31, 1992 (*see* Lenhart 9/17/99 Aff. filed in support of Summary Judgment Motion). All of the NatWest Transfers which are the subject of the instant adversary proceeding occurred between June 10, 1991 and January 10, 1992 and, consequently, occurred while FSEC was insolvent.

■ The record is devoid of any credible evidence that FSEC was solvent on those dates, *except for an unsupported statement in the Governale Affidavit that FSEC was solvent at the time of the transfers.* Although Governale claims to have personal knowledge that FSEC was solvent, Governale's memory has proved to be wrong with respect to other facts, notably the principal amount of the personal loan to Santora secured by the NatWest Mortgage, which Governale stated was $619,294.96 (Governale 11/30/99 Aff., ¶¶ 7, 11) and which reference to the documents reveals was $825,000. Therefore, the Court will not rely on Governale's memory alone.

In a recent case in this district, *In re Lollipop*, 205 B.R. 682 (Bankr.E.D.N.Y. 1997), the chapter 7 trustee moved for summary judgment in a fraudulent conveyance action brought pursuant to 11 U.S.C. § 544(b) and DCL § 273 arising from the issuance of certain checks to the wife of the debtor's principal. The trustee in that case supported the summary judgment motion with an accountant's affidavit showing that the debtor was insolvent at the time of each of the challenged transfers. The wife of the debtor's principal provided no information to controvert the accountant's statement. *Lollipop*, at 687. Based on this, Judge Duberstein found that there was no issue of material fact requiring a trial as to solvency. *Lollipop* is directly on point. In the present case, NatWest has submitted no information to contradict the very specific analysis contained in the Lenhart Affidavit showing

**374**

that FSEC was insolvent at the time of the NatWest Transfers. As in *Lollipop*, the Trustee's unchallenged proof means that there is no issue of material fact requiring a trial on the question of FSEC's solvency at the time of the eight (8) NatWest Transfers. Accordingly, the second element of DCL § 273 has also been established.

Based on the record before this Court, the Trustee has established his fraudulent conveyance claim pursuant to DCL § 273.

■ Section 273-a of the New York Debtor and Creditor Law provides that [e]very conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant, if after final judgment for the plaintiff, the defendant fails to satisfy the judgment. N.Y. Debtor and Creditor Law § 273-a (McKinney 1990). To prevail on a DCL § 273 fraudulent conveyance claim, a plaintiff must prove that (1) the conveyance in question was made without fair consideration; (2) at the time of the transfer, the transferor was a defendant in an action for money damages or a judgment had been docketed against the transferor; and (3) a final judgment has been rendered against the transferor that remains unsat-

isfied. *Lippe v. Bairnco Corp.*, 229 B.R. 598, 603 (S.D.N.Y.1999) (citing *Hassett v. Goetzmann*, 217 B.R. 9, 20 (N.D.N.Y.1998); *In re Fair*, 142 B.R. 628, 631 (Bankr. E.D.N.Y.1992)). As set forth above, the NatWest Transfers were made without fair consideration.

■ In addition, the Trustee has presented evidence from which the Court can conclude that on August 20, 1990, a judgment in the amount of $4,975 had been docketed against FSEC in Queens County, which judgment was unsatisfied at the time of the eight (8) NatWest Transfers. Specifically, the New York City Commissioner of Finance issued a tax warrant for FSEC's failure to pay Commercial Rent/Occupancy Tax for the period June 1, 1987 to May 31, 1988, in the amount of $4,975, and directed the city sheriff to levy upon the real and personal property of FSEC for the amount thereof, with penalties and interest, and, pursuant to NYC Code § 11–712, the city sheriff filed said warrant in the office of the Queens County Clerk on August 20, 1990, whereupon said warrant was entered by the clerk in the judgment docket. A judgment lien search shows that the tax warrant remains unsatisfied (Summary Judgment Motion, Exh. D). New York law provides that a docketed tax warrant is the equivalent of a docketed judgment of a court of record, NYC Code § 11–712,[11] *accord, United States v.*

11. NYC Code § 11–712 provides, in pertinent part, as follows:

Proceedings to recover tax.

b. As an additional or alternate remedy, the commissioner of finance may issue a warrant, directed to the city sheriff commanding the sheriff to levy upon and sell the real and personal property of such person which may be found within the city, for the payment of the amount thereof, with any penalties and interest, and the cost of executing the warrant, and to return such warrant to the commissioner of finance and to pay to the commissioner the money collected by virtue thereof within sixty days after the receipt of such warrant. The city sheriff shall, within five days after the receipt of the warrant, file with the county clerk a copy thereof, and thereupon such

clerk shall enter in the judgment docket the name of the person mentioned in the warrant and the amount of the tax, penalties and interest for which the warrant is issued and the date when such copy is filed. Thereupon the amount of such warrant so docketed shall become a lien upon the title to and interest in real and personal property of the person against whom the warrant is issued. *The city sheriff shall then proceed upon the warrant in the same manner and with like effect as that provided by law in respect to executions issued against property upon judgments of a court of record. . . . If a warrant is returned not satisfied in full, the commissioner of finance may from time to time issue new warrants and shall also have the same remedies to enforce the amount due thereunder as if*

*Herzog (Matter of Thriftway Auto Rental Corp.),* 457 F.2d 409, 411 (2d Cir.1972) ("To be sure, sentence four of the Code section intends that docketed warrants may be treated as docketed judgments . . . .") and, therefore, at the time of the NatWest Transfers a judgment had been rendered against FSEC that remained unsatisfied. Consequently, the second and third elements of a fraudulent conveyance pursuant to DCL § 273–a have been established.

NatWest argues that the Trustee cannot prevail on its claim pursuant to DCL § 273–a because the Trustee was not the plaintiff in an action in which a judgment was entered against FSEC. However, NatWest cites no case law in support of this proposition, and the case law in the Eastern and Southern Districts of New York clearly supports the Trustee's position. *See, e.g., In re Pappas,* 239 B.R. 448, 454 (E.D.N.Y.1999) (11 U.S.C. § 544(b) grants to the trustee an extraordinary power to step into the shoes of unsecured creditors and avoid any transfer of a debtor's interest in property that is voidable pursuant to N.Y. Debt. & Cred. Law § 273–a); *In re Fair,* 142 B.R. 628, 630–31 (Bankr. E.D.N.Y.1992) (discussing trustee's application of 11 U.S.C § 544(b) to avoid a transfer pursuant to N.Y. Debt. & Cred. Law § 273–a); *In re Fill,* 82 B.R. 200, 219–20 (Bankr.S.D.N.Y.1987); *In re Newman,* 11 B.R. 628, 634 (Bankr.S.D.N.Y.); *aff'd,* 15 B.R. 658 (S.D.N.Y.1981); *Matter of Russo,* 1 B.R. 369, 378–79 (Bankr. E.D.N.Y.1979).

Based on the foregoing, the Trustee has established his fraudulent conveyance claim pursuant to DCL § 273–a.

## V. The NatWest Transfers Were Preferences Pursuant to 11 U.S.C. §§ 547(b) and 550(a)

■■■■ Summary judgment is also appropriate on the Trustee's preference claim, since NatWest was paid the $87,874.10 in preference to FSEC's other creditors so as to confer a benefit on FSEC's principal. To establish that the NatWest transfers were preferential payments, the Trustee bears the burden of demonstrating that the transfers were (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made (A) on or within 90 days before the date of the filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and (5) that enables such creditor to receive more than such creditor would receive if (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title. 11 U.S.C. § 547(b); *In re Lan Yik Foods Corp.,* 185 B.R. 103, 107 (Bankr. E.D.N.Y.1995). A Section 547(b)(5) evaluation is to be made as of the time the debtor filed its bankruptcy petition. *Lan Yik Foods,* 185 B.R. at 108 citing *Sloan v. Zions First Nat'l Bank (In re Castletons Inc.),* 990 F.2d 551, 554 (10th Cir.1993); *Neuger v. United States (In re Tenna Corp.),* 801 F.2d 819, 822 (6th Cir.1986). The Court has already found that the *Deprizio* doctrine applies in this case, which decision was affirmed on appeal in a related adversary proceeding. *In re Frank Santora Equipment Corp.,* 231 B.R. 486 (E.D.N.Y.1999).

■■■■ In the instant case, all of the elements for a preference have been demonstrated and/or admitted. (1) The NatWest Transfers were transfers to a creditor, the Defendant, and for the benefit of a creditor, Frank Santora, an insider of FSEC. (2) The NatWest Transfers were for or on account of an antecedent debt purportedly

*the city had recovered judgment therefor and execution thereon had been returned*

*unsatisfied.* (emphasis supplied)

owed by FSEC under the Lease. (3) The NatWest Transfers were made while the Debtor was insolvent, which element was discussed above. (4) The NatWest Transfers were made within one year of the Filing Date (which time frame is applicable pursuant to the *Deprizio* doctrine). (5) The NatWest Transfers enabled the Defendant to receive more than it would have received if the case were a case under chapter 7, the transfer had not been made, and NatWest had received payment of the debt to the extent provided by the Bankruptcy Code, since, as of the Filing Date, FSEC was insolvent with assets of approximately $1.7 million and liabilities of approximately $11.9 million, and this debt was not secured by any assets of FSEC.

 NatWest has pleaded an "ordinary course" defense, based solely on the existence of the Lease and the fact that the payments were made on or about the tenth day of every month. Pursuant to 11 U.S.C. § 547(g), it is NatWest's burden to establish such a defense. To support an ordinary course defense, a defendant must show that the challenged payments were (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and (C) made according to ordinary business terms. 11 U.S.C. § 547(c)(2).

 The mere existence of a Lease between FSEC and Santora is not evidence that payment of Santora's personal mortgage obligation to NatWest was in the ordinary course of business or financial affairs between FSEC and NatWest. NatWest provides no document showing any agreement to make such payments. Although NatWest argues that the transfers were Lease payments, the payments were not even made in the amount set forth in the Lease. The Lease provides for payments of $120,000 per year in equal monthly payments of $10,000 per month. However, the NatWest Transfers are in varying amounts, all exceeding $10,000 per month. Further, according to the Lease, the Lease term began on January 1, 1987. However, NatWest provides no schedule of Lease payments prior to the eight (8) NatWest Transfers. Accordingly, the Court has no way of knowing whether the NatWest Transfers (assuming they were Lease payments), which were evenly spaced during eight (8) consecutive months, were in the ordinary course of business or financial affairs between FSEC and NatWest or whether they were even meant to represent rent for the actual months in which the transfer was made. That is why the entire payment history must be shown. *See In re Valley Steel Products*, 166 B.R. 1006, 1010 (Bankr. E.D.Mo.1993). Finally, NatWest provides no evidence that the NatWest Transfers were made according to ordinary business terms. This requires that a defendant demonstrate that the terms of a payment fall within the bounds of ordinary practice of others similarly situated. *See Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.)*, 78 F.3d 30, 43 (2d Cir.1996) (creditor bears the burden of proof to show industry practice; Ford did not sustain its burden as it submitted no evidence of industry practice or custom apart from its experience with Roblin).

In sum, this is not the type of transaction that is protected by an ordinary course defense. *See In re Sanders*, 213 B.R. 324, 334 (Bkrtcy.M.D.Tenn.1997) (payment by debtor of mother's personal obligation not protected by ordinary course defense).

In view of the foregoing, the Trustee is entitled to summary judgment on this preference claim.

## CONCLUSION

1. This Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a), 11 U.S.C. §§ 544(b), 547 and 550(a), N.Y. Debtor &

Creditor Law §§ 273 and 273–a, and Fed. R. Bankr.P. 7001.

2. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(F) and (H).

3. The fraudulent conveyance claims contained in the Second Amended Complaint arose out of the conduct, transaction or occurrence pleaded in the original complaint and, therefore, pursuant to Fed. R.Civ.P. 15(c)(2), relate back to the date of the original complaint. Thus, the fraudulent conveyance claims are not time barred.

4. Since NatWest had substantial justification for failing to disclose the existence of the Lease and its failure to disclose same was harmless, the Lease will not be precluded as evidence in opposition to the Summary Judgment Motion.

5. The defenses of laches, waiver and estoppel are unavailable to NatWest.

6. The Trustee is entitled to summary judgment on its fraudulent conveyance claims pursuant to 11 U.S.C. § 544(b) and DCL §§ 273 and 273–a, in the amount of $87,874.10 plus interest at the rate of nine (9%) percent per annum.

7. The Trustee is entitled to summary judgment on its preference claim pursuant to 11 U.S.C. §§ 547(b) and 550(a), in the amount of $87,874.10, plus interest at the rate of nine (9%) per annum.

8. NatWest's Cross–Motion for Summary Judgment to dismiss the complaint. as amended, is denied in its entirety.

Simultaneously herewith an Order granting summary judgment in the sum of $87,874.10, plus interest at the rate of 9% per annum from the date of each transfer, in favor of the Trustee and against NatWest and denying NatWest's motion for summary judgment will be entered by the Court.