In re TRACE INTERNATIONAL HOLDINGS, INC., et al., Debtors.

John S. Pereira, as Chapter 7 Trustee of Trace International Holdings, Inc., et al., Plaintiff,

v.

The Equitable Life Insurance Society of the United States, Defendant.

John S. Pereira, as Chapter 7 Trustee of Trace International Holdings, Inc., et al., Plaintiff,

v.

Lambert Brussels Financial Corp., Defendant.

John S. Pereira, as Chapter 7 Trustee of Trace International Holdings, Inc., et al., Plaintiff,

v.

BMA Limited Partnership, Defendant.

Bankruptcy Nos. 99–10425(SMB), 99–10426(SMB).
Adversary Pro. Nos. 01–2946 to 01–2948.

United States Bankruptcy Court, S.D. New York.

Jan. 29, 2003.

---

Jaspan, Schlesinger, Hoffman, LLP, Harold D. Jones, Eugene P. Cimini, Jeffrey Schwartz, Of Counsel, Garden City, NY, Attorneys for Plaintiff.

Debevoise & Plimpton, Lorna G. Schofield, Steven S. Michaels, Of Counsel, New York City, Attorneys for The Equitable Life Insurance Society of the United States and Lambert Brussels Financial Corp.

Simpson, Thacher & Bartlett, John J. Kenney, Of Counsel, New York City, Attorneys for BMA Limited Partnership.

## MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART DEFENDANTS' ALTERNATIVE MOTIONS FOR JUDGMENT ON THE PLEADINGS OR SUMMARY JUDGMENT

STUART M. BERNSTEIN, Chief Judge.

John S. Pereira, the chapter 7 trustee of the estate of Trace International Holdings, Inc. ("Trace"), commenced these adversary proceedings under bankruptcy and state law to avoid and recover actual and constructive fraudulent transfers aggregating $2.1 million. The principal question in all three cases is whether an insolvent corporation can pay dividends to its preferred stockholders.

The defendants Equitable Life Insurance Society of the United States ("Equitable") and Lambert Brussels Financial Corporation ("Lambert") have moved in

the alternative for judgment on the pleadings or summary judgment in the cases brought against them. The defendant in the third case, BMA Limited Partnership ("BMA"), did not file its own motion, and seeks to join in Equitable's. While BMA is not a party to the Equitable action, and cannot, therefore, technically join in Equitable's motion, the factual and legal issues presented in the two cases are identical except for the amounts of the transfers. Accordingly, BMA will be deemed to have adopted Equitable's motion as its own motion in the adversary proceeding brought against it by the trustee, and the three defendants will be referred to collectively as the Movants.

For the reasons that follow, the motions for judgment on the pleadings are granted to the extent of dismissing the trustee's claims based on actual fraud as well as any claims based on the preference provisions of the Bankruptcy Code, 11 U.S.C. § 547. The motions are denied in all other respects.

## BACKGROUND

### A. Introduction

Trace, known during earlier times as Knoll International Holdings, Inc. and '21' International Holdings, Inc. (collectively "Trace"), is a Delaware corporation. Until 1992, it had four classes of stock: Class A Common, Class B Common, Convertible Preferred and Preferred. (*Declaration Of Steven S. Michaels in Support of the Motion for Judgment on the Pleadings, or, in the Alternative, Summary Judgment,* dated August 13, 2002 ("*Michaels Declaration*"), Ex. 5 (Restated Certificate Of Incorporation of Knoll International Holdings, Inc.)("Trace Charter"), § 4.01.) [1] (*Id.,*

---

1. Lambert and Equitable are represented by the same law firm, and filed substantially similar motion papers. Aside from the join- der, BMA did not file papers in its own adversary proceeding. Unless otherwise indicated,

Ex. 7.) At all relevant times, the Movants have held Convertible Preferred Stock.

Section 4.04 of the Trace Charter governed the rights of the holders of Convertible Preferred Stock. It called for Trace to pay cumulative dividends at the annual rate of 6% "when, as and if declared, so long as permitted under the General Corporation Law." (*Id.*, Ex. 5, § 4.04(a).) Dividends accrued on a daily basis, and were payable semi-annually on the last day of June and December. (*Id.*) Trace could not declare or pay dividends to the Common Stockholders unless full cumulative dividends had been declared and paid to the Convertible Preferred Stockholders (or declared and reserved for). (*Id.*, § 4.04(g)(i).) In addition, Trace could not redeem or repurchase any common stock if it was in default in the payment of dividends to the Convertible Preferred Stockholders. (*Id.*, § 4.04(g)(ii).)

In 1992, Trace added a class of Series A Preferred Stock. The rights of the Series A Preferred Stockholder were governed by the "Certificate of Designations of the Series A Preferred Stock of '21' International Holdings, Inc." ("Certificate of Designations") (*Michaels Declaration*, Ex. 7.) The holder received treatment similar to what the Convertible Preferred Stockholders received, except that the Series A Preferred dividends were payable quarterly. In addition, the Certificate of Designations stated that "[t]he Series A Preferred Stock shall rank *pari passu* with the Corpora-

tion's Convertible Preferred Stock ... with respect to the payment of dividends." (*Id.*, § 3(ii).) The Trace Charter was never amended to include a comparable *pari passu* clause in the section dealing with the rights of the Convertible Preferred Stockholders.

On or about January 3, 1995, Trace made a $300,000.00 dividend payment to Lambert. (*Michaels Declaration*, Ex. 2 (Answer to Amended Complaint), at ¶ 12.) The payment reflected dividends accrued and owing for the two semi-annual periods comprising the 1994 calendar year. (*Statement Pursuant to Local Rule 7056.1*, dated Aug. 15, 2002, at ¶ 2.)[2] Trace did not pay any other dividends to the holders of the Convertible Preferred shares in 1995 or 1996.

## B. The Proceedings in Delaware Chancery Court

The Series A Preferred Stockholder fared much better. Beginning in January 1995, it regularly received its quarterly dividends.[3] As a result, on August 21, 1996, Anthony G. Barbuto, the trustee in dissolution of Lambert, commenced a derivative action in Delaware Chancery Court against Trace and several of its officers and directors. Barbuto alleged, in the main, that the payment of any future dividends would impair Trace's capital, and violate § 170(a) of Delaware's General Corporation Law.[4] Charging that the indi-

---

the record references in this opinion refer to the papers filed by Lambert.

**2.** The *Rule 7056.1 Statement* states that the January 1995 payment satisfied, *inter alia*, the July–December 1995 payment. I assume that this is an error, and Lambert meant 1994.

**3.** The payments to the Series A Preferred Stockholder are the subject of a separate fraudulent transfer proceeding commenced by the trustee. *See Pereira v. Dow Chemical*

Co. (*In re Trace Int'l Holdings, Inc.*), 287 B.R. 98 (Bankr.S.D.N.Y.2002)(*"Trace"*).

**4.** DGCL § 170(a) states:

The directors of every corporation, subject to any restrictions contained in its certificate of incorporation, may declare and pay dividends upon the shares of its capital stock, or to its members if the corporation is a nonstock corporation, either (1) out of its surplus, as defined in and computed in accordance with §§ 154 and 244 of this title, or (2) in

vidual defendants had breached their fiduciary duties, Barbuto sought to block the payment of future dividends or redemption of stock for so long as Trace's capital was impaired. Alternatively, he sought to compel the payment of dividends that, he argued, accrued to Lambert under the *pari passu* clause in the Certificate of Designations. (*Michaels Declaration*, Ex. 9 (*Complaint for Injunctive and other Relief*, dated Aug. 21, 1996, filed in *Barbuto v. Trace Int'l Holdings, Inc., et al.*)(Del. Ch. C.A. No. 15175).)

### 1. The Standstill Agreement and the Expedition Order

The next quarterly dividend payment to the Series A Preferred Stockholder, in the sum of $175,000.00, was scheduled to be made on November 1, 1996. With payment looming, Barbuto moved for expedited discovery and an expedited trial. (*Michaels Declaration*, Ex. 10.) As noted, he contended that the payment would impair Trace's capital and violate Delaware law. The defendants responded, *inter alia*, with a nine page letter, dated September 18, 1996, to Vice Chancellor Jacobs. (*Id.*, Ex. 14). The letter made three points germane to this proceeding. First, the payment would not impair Trace's capital in light of the substantial market value of Trace's assets. (*Id.*, Ex. 14, pp. 2–5.) Second, even if the directors were held

personally liable, "Trace's D & O policy . . . would almost certainly cover any judgment the directors had to pay to the corporation." (*Id.*, Ex. 14, pp. 6–7.)

Third, Trace made a promise which the Movants have termed a "Standstill Agreement." To put the promise in context, it helps to understand the dispute concerning the *pari passu* clause. As mentioned earlier, the clause appeared in the Certificate of Designations that created the Series A Preferred Stock. No specific comparable change, however, was made to the Trace Charter for the benefit of the Convertible Preferred Stockholders.

This omission led to a dispute over interpretation. The defendants in the Barbuto action maintained that the *pari passu* clause required Trace to pay a dividend to the Series A Preferred Stockholder if it paid a dividend to the Convertible Preferred Stockholders, but not *vice versa*. (*Michaels Declaration*, Ex. 19, at 15.) The Convertible Preferred Stockholders, on the other hand, argued that it created equality. If Trace paid a dividend to the Series A Preferred Stockholder, as it planned to do on November 1st, it had to pay a comparable dividend to the holders of the Convertible Preferred Stock.

To avoid litigating the dispute at that time, Trace temporarily agreed to pay a

case there shall be no such surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year. If the capital of the corporation, computed in accordance with §§ 154 and 244 of this title, shall have been diminished by depreciation in the value of its property, or by losses, or otherwise, to an amount less than the aggregate amount of the capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets, the directors of such corporation shall not declare and pay out of such net profits any dividends upon any shares of any classes of its capital stock until the deficiency

in the amount of capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets shall have been repaired. Nothing in this subsection shall invalidate or otherwise affect a note, debenture or other obligation of the corporation paid by it as a dividend on shares of its stock, or any payment made thereon, if at the time such note, debenture or obligation was delivered by the corporation, the corporation had either surplus or net profits as provided in clause (1) or (2) of this subsection from which the dividend could lawfully have been paid.

dividend to the Convertible Preferred Stockholders in the event it paid the challenged dividend to the holder of the Series A Preferred Stock:

> Although defendants maintain that plaintiff has not asserted a colorable claim requiring prompt relief and has failed to demonstrate the threat of irreparable injury, to the extent the Court remains concerned about the issuance of a dividend to the holders of the Series A Preferred Stock on or about November 1, the defendants will agree not to pay a dividend to the holders of the Series A Preferred Stock unless they also declare and pay a dividend to the holders of the Convertible Preferred Stock during the course of this litigation. Payment to the holders of both classes of preferred stock eliminates plaintiff's concern that he is being denied the opportunity to receive dividends on a *pari passu* basis with the holder of the Series A Preferred Stock.

(*Id.*, Ex. 14, p. 8.)

The defendants also promised to give Barbuto notice before paying any other dividends:

> Defendants also will agree that if the Trace board should determine to pay a dividend to the holders of any stock during the course of this litigation, they will provide the plaintiff with any documents or other information the Trace board considered in determining to pay the dividend. With prior notice, plaintiff can seek injunctive relief to preclude the payment of the dividend if plaintiff believes Trace lacks sufficient surplus under Section 170 to pay the dividend.

(*Id.*)

Finally, the defendants reserved their rights:

> Defendants' agreement to these limitations and obligations is without waiver of their rights and is solely for the purpose of avoiding the costs and burdens associated with expedited proceedings.

(*Id.*)

Judge Jacobs denied Barbuto's motion the next day. In a letter to counsel, dated September 19, 1996 (the "Expedition Order"), he explained his reasons:

> The plaintiff has moved for an order granting expedited discovery and setting an early trial date in this action to enjoin, *inter alia,* the payment of a dividend by the corporate defendant [Trace]. The basis for the plaintiff's claim is that a $175,000 quarterly dividend to be paid on November 1, 1996 is illegal, because the corporation's 1995 audited consolidated financial statement shows that the corporation's capital is presently impaired.
>
> The defendants vigorously dispute that claim. They argue that when measured on a fair market value basis, the corporation's assets generate a net capital surplus of over $50 million, which is more than ample to pay a $175,000 dividend. Moreover, defendants argue, the plaintiffs (who have not moved for a preliminary injunction) have shown no reason why this case must be accorded expedited treatment. Nor, they say, can such a showing be made, because (a) the dividend will not impair the company's normal operations, and (b) should the directors be found to have caused the corporation to pay a wrongful dividend, they (and their D & O insurance carrier) are fully capable of responding to any money judgment. At least the plaintiffs have not claimed or shown otherwise.
>
> Having reviewed the parties' lengthy submissions on this question, I conclude that the defendants have the better position.

(*Michaels Declaration,* Ex. 15.)

After the Expedition Order was issued, and during the pendency of the Barbuto

action, Trace made the following payments to the Movants [5]:

| Approximate Date of Payment | Lambert | Equitable | BMA |
| --- | --- | --- | --- |
| January 1997 | 150,000.00 | 266,402.00 | 33,598.00 |
| July 1997 | 150,000.00 | 266,402.00 | 33,598.00 |
| January 1998 | 150,000.00 | 266,402.00 | 33,598.00 |
| July 1998 | 150,000.00 | 266,402.00 | 33,598.00 |
| | 600,000.00 | 1,065,608.00 | 134,392.00 |

The trustee seeks to recover all of these payments, in addition to the January 1995, $300,000.00 payment to Lambert, in these three adversary proceedings.

### 2. Partial Summary Judgment and Remedial Order

Subsequent discovery in the Barbuto action revealed two facts that changed Barbuto's focus. First, Trace appeared to have a capital surplus, and consequently, dividend payments would not violate § 170 of the Delaware Corporation Law. Second, and more important, Trace had redeemed the stock of and paid dividends to other common and preferred shareholders in 1995 and 1996. This arguably triggered similar rights in favor of the other Convertible Preferred Stockholders, including Barbuto, who had been ignored. (*See Michaels Declaration*, Ex. 17.)

As a result, Barbuto moved for partial summary judgment in late March 1998. He sought, without objection, to dismiss his claim under § 170. He also petitioned, over the defendants' objection, to compel Trace to purchase all of the outstanding

Convertible Preferred Stock and to satisfy all of the unpaid dividends. He relied on both the *pari passu* clause and the Trace Charter clause that prevented Trace from repurchasing common stock without satisfying accrued dividends owed to the holders of the Convertible Preferred Stock.

On April 8, 1999, Judge Jacobs granted the motion in part, finding it unnecessary to rule on Barbuto's claims under the *pari passu* clause. (*See Michaels Declaration*, Ex. 22, at 73–74.) Trace conceded that it had repurchased common stock in December 1995, January 1996 and April 1996. (*See id.*, Ex. 19 (*Defendants' Answering Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment*, dated, May 15, 1998), at 9.) The repurchases violated § 4.04(g)(ii) of the Trace Charter because the semi-annual dividends payable to the Convertible Preferred Stockholders on June 30, 1995 and December 31, 1995 had not been paid. The ensuing order (the "Remedial Order"), dated May 21, 1999, directed Trace to pay the dividends, accrued but unpaid, for the semi-annual periods ending on June 30, 1995, December 31, 1995 *and June 30, 1996.*[6] (*Id.*, Ex. 23.)

It does not appear that Trace made payments ordered by the Remedial Order, and the trustee is not seeking to recover any. In fact, Trace filed its chapter 11 petition only two months later.

### C. The Bankruptcy Proceedings

On July 21, 1999, Trace and certain affiliates filed voluntary petitions under chap-

---

5. The record does not set forth the timing or amount of the payments to BMA. The trustee's complaint, however, seeks to recover $134,392.00 from BMA. Further, BMA's motion to join in Equitable's motion states that BMA "holds identical shares and has received exactly the same dividends proportionally as The Equitable." I assume, therefore, that BMA received the aggregate sum of $134,392.00 in four installments at the same

time that Equitable (and Lambert) received their dividend payments.

6. The award of the June 30, 1996 dividend does not appear to have been warranted. The dividends on the Convertible Preferred Stock accrued daily, but were payable semi-annually. When Trace made the final common stock repurchase in April 1996, the June 30, 1996 dividend was not yet payable.

ter 11 of the Bankruptcy Code. The chapter 11 cases were converted to chapter 7 on January 24, 2000, and shortly thereafter, the plaintiff became the trustee. In July 2001, the trustee commenced these three adversary proceedings to recover the dividends paid to the Convertible Preferred Stockholders. With the exception of the $300,000.00 payment to Lambert in January 1995, the timing and circumstances of the dividend payments to the Movants were the same.

### D. This Motion

Lambert and Equitable thereafter filed motions for judgment on the pleadings, or alternatively, summary judgment, and BMA joined in Equitable's motion. The Movants primarily argue that the payments were made on account of antecedent debts, and cannot be recovered as constructive fraudulent transfers.

Two assumptions run throughout the Movants' papers. First, Judge Jacobs relied on the Standstill Agreement when he denied Barbuto's motion to expedite and signed the Expedition Order. In essence, he ordered the payments that the trustee is attempting to avoid and recover.[7] Accordingly, any effort to recover the payments improperly interferes with the Delaware court's supervisory authority and control over Delaware corporations. Sec-

ond, because the trustee cannot "unwind" all of the transactions related to the dividend payments, he cannot recover the dividends. From these assumptions, as well as others, the Movants invoke principles of federalism, contract law, due process and other constitutional principles in support of their motions.[8]

The trustee opposed the motions, arguing, in the main, that he was not bound by anything that transpired in the Barbuto litigation. The trustee also took issue with the Movants' characterizations of the earlier events and their significance.

### DISCUSSION

### A. Intentional Fraud and Judgment on the Pleadings

■■■ The trustee's pleadings allege that Trace paid the dividends with the actual intent to hinder, delay and defraud its creditors. The Movants seek judgment on the pleadings pursuant to FED R. CIV. P. 12(c), dismissing these claims.[9] A motion for judgment on the pleadings is governed by the same standards that apply to a motion to dismiss for failure to state a claim under FED. R. CIV. P. 12(b)(6). *King v. American Airlines, Inc.*, 284 F.3d 352, 356 (2d Cir.2002); *D'Alessio v. New York Stock Exch., Inc.*, 258 F.3d 93, 99 (2d Cir.2001). Furthermore, the requirements

---

7. This argument does not apply to the January 1995 payment made to Lambert.

8. Lambert and Equitable each filed a Notice of Claim of Unconstitutionality with respect to 11 U.S.C. §§ 544(b) and 548 of the Bankruptcy Code and the fraudulent conveyance provisions of the New York Debtor & Creditor Law, §§ 272–77. Their notices did not mention the corresponding provisions of the Delaware fraudulent transfer law, although the trustee relied on Delaware law to the same extent as New York law.

I provided the notice called for by 28 U.S.C. § 2403 to the attorneys general of the United

States and New York State, and each advised the Court that he did not intend to intervene. Perhaps I should have notified the attorney general of Delaware too. Given the disposition of the motions, the oversight is immaterial.

9. The Movants have also requested the dismissal of any preference claims. Although the trustee's complaints list 11 U.S.C. § 547 as one of the statutory predicates for his claims, the complaints do not purport to allege preferences. Accordingly, any preference claims are dismissed.

for pleading fraud with particularity under FED. R. CIV. P. 9(b) apply to claims of intentional fraudulent transfer. *See Atlanta Shipping Corp. v. Chemical Bank,* 818 F.2d 240, 251 (2d Cir.1987)(allegations of actual fraudulent intent under N.Y. Debtor & Creditor Law § 276 must plead the requisite mental intent with particularity).

■ The trustee's claims based on actual fraud fail to pass muster. He pleads only legal conclusions, and does not, as Rule 9(b) requires, "allege facts that give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994); *accord Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.,* 117 F.3d 655, 663 (2d Cir.1997). Accordingly, the Movants are entitled to judgment on the pleadings dismissing the claims based on actual fraudulent transfer.

## B. Constructive Fraud and Summary Judgment

The Movants seek summary judgment dismissing the trustee's constructive fraudulent transfer claims. To prevail on these claims, the trustee must prove three elements: (1) Trace transferred an interest in property, (2) the transfer was made at a time when Trace was insolvent or the transfer rendered Trace insolvent[10], and (3) Trace made the dividend payments for less than "reasonably equivalent value" under Bankruptcy Code § 548(a)(1)(B)(i) and Delaware's version of the Uniform Fraudulent Transfer Act, DEL. CODE ANN., tit. 6,

§ 1305 (2002 Supp.), or for less than fair consideration under New York's version of the Uniform Fraudulent Conveyance Act. N.Y DEBT. & CRED. LAW § 273 (McKinney 1990).

■ The dividend payments undeniably involved transfers of Trace's property. Furthermore, Trace's solvency is a question of fact that cannot be resolved on this motion.[11] The Movants nevertheless contend that the dividends represented the payment of contract or "antecedent debts." The payment of antecedent debts satisfies the definition of "value" under the fraudulent conveyance laws, 11 U.S.C. § 548(d)(2)(A); DEL. CODE ANN., tit. 6, § 1303(a); N.Y DEBT. & CRED. LAW § 272(a), and if reasonably or fairly equivalent to the transfer, will defeat the trustee's claim.

■ The Movants have identified three possible sources of Trace's obligation to pay the dividends at issue: (1) the Standstill Agreement, (2) the *pari passu* clause in the Certificate of Designations, and (3) the Remedial Order. None, however, establishes a right to payment as a matter of law.

### 1. The Standstill Agreement

#### a. Judge Jacobs' Reliance on the Standstill Agreement

The Movants' argue that the Standstill Agreement is not just a contract; it is an agreement that Judge Jacobs relied on and implicitly approved when he denied the Expedition Order. The record, howev-

---

**10.** "Insolvency" is used as shorthand to refer to the alternative financial tests under the constructive fraudulent conveyance laws.

**11.** In a footnote to its moving brief, (p. 31, n. 16), Lambert stated that Judge Jacobs rejected Trace's claims of insolvency in 1996 and 1999. This statement stretches the record. The 1996 Expedition Order did not involve an

adjudication on the merits. Rather, Barbuto failed to sustain his burden of persuasion. In 1999, Judge Jacobs granted Barbuto's motion, without objection, to dismiss his claim that the dividend payment would impair Trace's capital (*i.e.,* the § 170 claim). The issue of Trace's solvency was never tested.

er, shows otherwise. Judge Jacobs denied the expedition motion because he was satisfied that the scheduled dividend payment would not impair Trace's capital or its operations, but if it did, the directors had enough D & O insurance to reimburse Trace. The Expedition Order did not mention the Standstill Agreement, despite the fact that it appeared in the same letter pleading with the defendants' other arguments that Judge Jacobs credited. Moreover, the Expedition Order noted that the $50 million surplus was "more than ample to pay a $175,000 dividend," and did not mention the Convertible Preferred Stock dividend.

The absence of any reference to the Standstill Agreement is hardly surprising. Barbuto was seeking to expedite the proceedings in light of the threatened violation of § 170 of the Delaware Corporation Law and the injury to Trace's capital. The Standstill Agreement, on the other hand, concerned Barbuto's alternative contract claim under the *pari passu* clause. The contract claim was inconsistent with Barbuto's primary argument that Trace could not pay any dividends. Furthermore, resolution of the contract claim was not urgent, and it did not justify expediting the proceedings.

Accordingly, I reject the suggestion that Judge Jacobs relied on the Standstill

Agreement.[12] At most, the Standstill Agreement is essentially a declaration of a discretionary dividend. Any dividends paid as a result of the Standstill Agreement should be treated no differently than any other dividend declared by a board of directors and paid by a corporation.

### b. The Standstill Agreement is Ambiguous

 Even if Judge Jacobs relied on the Standstill Agreement, summary judgment is still not warranted. A court may grant summary judgment if an agreement is unambiguous and conveys a definite meaning, or the contract is ambiguous but there is no extrinsic evidence of the parties' intent. *Chase Manhattan Bank, N.A. v. American Nat'l Bank & Trust Co.*, 93 F.3d 1064, 1073 (2d Cir.1996); *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993). Ambiguity is a question of law that the court must decide in light of the entire agreement. *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d at 1094–95. An agreement is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who examines the entire contract and knows the customs, practices, usages and terminology general-

12. The Movants' reliance on judicial estoppel suffers from the same incorrect premise. They contend that "once Trace represented to Judge Jacobs that Trace would treat the Convertible Preferred Stock on a *pari passu* basis with the [Series A Preferred] Stock, Trace was estopped from doing otherwise." (*Memorandum in Support of Motion for Judgment on the Pleadings, or, in the Alternative, Summary Judgment of Defendant [Lambert]*, dated Aug. 15, 2002 ("*Lambert Memo*"), at 24.) The Movants cannot show, as they must, that Judge Jacobs adopted Trace's allegedly inconsistent position relating to the equal treatment of the Convertible Preferred Stockholders in the Barbuto action. *See Mitchell v. Washing-*

*tonville Central School District*, 190 F.3d 1, 6 (2d Cir.1999)("A party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner."). The Delaware law of judicial estoppel, which the Movants cite, has the same requirement. *Siegman v. Palomar Med. Tech.*, No. C.A. 15894, 1998 WL 409352, at *3 (Del.Ch. July 13, 1998)(Jacobs, V.C.)("Judicial estoppel prevents a litigant from advancing an argument that contradicts a position previously taken by that same litigant, and that the Court was persuaded to accept as the basis for its ruling.").

ly understood in the particular trade or business. *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d at 1095; *Brass v. American Film Tech., Inc.,* 987 F.2d 142, 149 (2d Cir.1993).

The Standstill Agreement is arguably subject to two constructions only one of which helps the Movants. On the one hand, it can be read as a limited promise to match the Series A Preferred Stock dividend due on November 1, 1996, but not a commitment to match any other future dividend. The first sentence seems to limit Trace's promise to the payment of the one dividend. More importantly, Trace's undertaking to give notice of future dividends, and afford Barbuto the chance to seek an injunction, is inconsistent with the notion that Trace agreed to pay a dividend to the Convertible Preferred Stockholders if it paid a dividend to the Series A Preferred Stockholders.[13] Lastly, Trace expressly reserved its rights. This suggests that Trace was agreeing to a one time payment, and intended to continue to litigate the issue.

On the other hand, the Standstill Agreement can be read more broadly. Its language also suggests, as the Movants argue, that the defendants agreed to provide *pari passu* treatment to all preferred shareholders during the course of the litigation. The notification provisions may reflect Barbuto's concern about the payment of any dividends, even to the Convertible Preferred Stockholders, if the payments would impair Trace's capital. In short, the Standstill Agreement does not establish Trace's obligation to pay all of the dividends at issue as a matter of law.

## 2. The *Pari Passu* Clause

The *pari passu* clause is also ambiguous based on Trace's failure to include a comparable provision, for the express benefit of the Convertible Preferred Stockholders, in the Trace Charter. Judge Jacobs considered both interpretations during the partial summary judgment motion in 1999. Although he expressed "a great deal of trouble" with the defendants' interpretation, he declined to decide the meaning of the *pari passu* clause, and instead relied on the Trace Charter provisions that barred the redemption of the common stock. (*Michaels Declaration,* Ex. 22, at 73.) The same ambiguities he pinpointed prevent me from concluding, as a matter of law, that the *pari passu* clause created a contract debt that was satisfied by the dividend payments.

## 3. The Remedial Order

Finally, the Remedial Order did not impose an obligation to pay the dividends that the trustee is now suing to recover. In fact, it did not even concern the dividends at issue because they had already been paid. The Remedial Order addressed other dividends that had not been paid, were apparently never paid and if they were paid, could have been recovered as preferences.

The Movants nevertheless maintain that if Trace had not already paid these dividends, Judge Jacobs would have ordered them to be paid in the Remedial Order. While this sounds plausible, it is not necessarily right. Judge Jacobs sat as a court of equity, and considered several different remedies. (*Id.,* at 56–62, 66–70.) The dividend arrearage at issue before Judge Jacobs amounted to approximately $2 mil-

---

13. The notice provision could not have related to the payment of common stock dividends. Under § 4.04(g)(i) of the Trace Charter, Trace could not pay dividends to the Common Stockholders unless it satisfied any cumulative dividends due and payable to the holders of the Convertible Preferred Stock.

lion. (*See id.,* at 69.) Barbuto's counsel argued that Trace had the means to pay it. (*Id.,* at 70.) The dividends at issue in this lawsuit also total approximately $2 million. If Judge Jacobs had been faced with a $4 million claim instead of a $2 million claim, he might have selected a different remedy.

In any event, what Judge Jacobs might or might not have done under a different set of facts is weak support for the Movants' position. The Remedial Order plainly did not direct Trace to pay the dividends that the trustee is attempting to recover. Moreover, had Trace paid them pursuant to the Remedial Order, they could have been recovered as preferences in the Trace bankruptcy filed two months later.

### 4. The Accrued Dividends Paid By Trace Were Not Antecedent Debts

■■■ There is a more elementary reason why the Movants' contract-based defense must fail. A corporation holds its assets in trust for the benefit of the corporation's creditors, and cannot lawfully distribute its assets to shareholders to the prejudice of those creditors. *Official Committee of Unsecured Creditors v. Reliance Capital Group, Inc. (In re Buckhead America Corp.),* 178 B.R. 956, 972 (D.Del. 1994); *Hamor v. Taylor–Rice Eng'g. Co.,* 84 F. 392, 395 (Cir.Ct.Del.1897); *see* 11 William Meade Fletcher, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 5329, at 675 (1995 rev. vol.)("FLETCHER"). Consequently, an insolvent Delaware corporation cannot pay a dividend. *EBS Litig. LLC v. Barclays Global Investors, N.A.,* 304 F.3d 302, 305 (3rd Cir.2002); *Trace,* 287 B.R. at 108–09. The unlawful dividend is voidable, *EBS Litig. LLC,* 304 F.3d at 305, and may be recovered by the trustee as a fraudulent transfer. *Trace,* 287 B.R. at 108–09; *see Official Comm. Of Unsecured Creditors of*

*Color Tile, Inc. v. Blackstone Family Inv. P'ship, L.P. (In re Color Tile, Inc.),* No. 96–76, 2000 WL 152129, at *5 (D.Del. Feb.9, 2000)(dividend declared by insolvent Delaware corporation is not "lawful," and is not an "antecedent debt" under fraudulent transfer law); *Pinellas County v. Great Am. Indus. Group, Inc.,* No. 90 C 5254, 1991 WL 259020, at *3 (N.D.Ill. Dec.2, 1991)(creditor of insolvent corporation may recover dividend payments to shareholders under Delaware common law without resort to fraudulent transfer law).

■■■ The same prohibition prevents an insolvent corporation from contracting to pay a dividend or redeem stock. In *Hamor v. Taylor–Rice Eng'g. Co.,* a corporation executed a promissory note, which it subsequently renewed, in consideration for its agreement to purchase the company stock from Willard, one of its stockholders. The transaction was approved by the corporation's board of directors. As a consequence of the corporation's insolvency, the federal court subsequently appointed a receiver who objected to the allowance of Willard's claim.

The issue before the court was whether Willard was entitled to share in the corporation's assets on an equal footing with the other creditors, or was relegated to the status of a shareholder. Noting the general rule that an insolvent corporation cannot contract to repurchase its stock or pay a dividend, the court concluded that the note was *ultra vires,* and consequently void:

[W]hether a corporation be solvent or insolvent, the fund represented by its capital stock must remain inviolate for the protection of its creditors. In the absence of statutory authority in that behalf a corporation has no legal power to reduce this fund by any formal or voluntary act or contract on its part, to the prejudice of its creditors either then or thereafter existing, whether by dis-

tributing any part of it among the stockholders by way of dividend, or by giving any part of it to one or more stockholders, or by disposing of any part of it in any other manner, except by way of changing its form to meet the exigencies of the corporate business. Such an act or contract is *ultra vires*, not only of the directors or stockholders, but of the corporation itself.

. . . .

[Willard] now seeks to be recognized as one of the creditors of the defendant. . . . The defendant was adjudged insolvent and receivers were appointed within four months after the giving of the original note; and it is admitted that there are not sufficient funds or property in their hands to pay the corporate indebtedness, exclusive of the alleged claim of Willard. . . . The note must be treated as an undertaking by the defendant to dispose of part of its capital stock to secure a surrender of Willard's shares. It was a contract to do what was *ultra vires* of the defendant, as against its creditors, and was a nullity; and, therefore, the note given in renewal is void.

84 F. at 397–98; *accord In re Fechheimer Fishel Co.*, 212 F. 357, 363 (2d Cir. 1914)(note given by solvent corporation to repurchase preferred stock was rendered unenforceable if the corporation was insolvent at the time that payment on the note became due)(decided under New York law), *cert. denied*, 234 U.S. 760, 34 S.Ct. 777, 58 L.Ed. 1580 (1914); *see Hazel Atlas Glass Co. v. Van Dyk & Reeves*, 8 F.2d 716, 717–18 (2d Cir.)(agreement to pay cumulative preferred dividends out of capital is unlawful and void), *cert. denied*, 269 U.S. 570, 46 S.Ct. 26, 70 L.Ed. 417 (1925).

 An insolvent corporation must prefer its creditors to its stockholders. This is what creditors expect and the law requires. The insolvent corporation cannot make distributions to shareholders, by redemption or dividend, and it matters not at all whether the corporation declares a dividend, purports to enter into a contract to pay one, or is assessed damages in the amount of the dividend based on its failure to pay it.[14] Accordingly, even if the Movants were contractually entitled to the payment of dividends under the Trace Charter or by virtue of contract, Trace's insolvency would have prohibited Trace from performing that contract, and rendered any dividends paid subject to recovery by the Trustee. Two wrongs do not a right make, and an insolvent Trace's unlawful repurchase of stock or the payment of dividends did not trigger an enforceable obligation to pay additional unlawful dividends.

**14.** The unique nature of dividends distinguishes this case from those cited by the Movants. *See FDIC v. Malin*, 802 F.2d 12, 18–19 (2d Cir.1986)(husband's obligation to support wife is an antecedent debt sufficient to satisfy the definition of "fair consideration"); *Central Hanover Bank & Trust Co. v. United Traction Co.*, 95 F.2d 50, 55 (2d Cir.1938)("It has never been deemed a fraudulent conveyance to pay an honest debt or to perform an obligation which the obligor was under a moral duty to perform, although the debt or obligation was legally unenforceable because of some statutory provision."); *CFTC v. Probber Int'l Equities Corp.*, 504 F.Supp. 1154, 1162 (S.D.N.Y.1981)(return of property loaned by transferee to transferor is supported by "fair consideration"). Under Delaware law, a dividend declared by an insolvent corporation does not create an antecedent debt. *Color Tile*, 2000 WL 152129, at *5. Further, an insolvent corporation may be able to pay a time-barred debt, but under Delaware law (as well as the law of most jurisdictions), it may not pay dividends. *EBS Litig. LLC v. Barclays Global Investors, N.A.*, 304 F.3d at 305; *Trace*, 287 B.R. at 108–109. Lastly, the *Probber* case stands for the unremarkable proposition that the repayment of a loan is supported by "fair consideration."

## C. The Movants' Unwinding Argument

The Movants contend that they would be aggrieved, in an unconstitutional manner, if they had to return the dividends because the trustee cannot "unscramble the egg" that Trace cracked open. First, the Convertible Preferred Stockholders lost their ability to litigate their rights to those dividends when Trace paid them in connection with the Standstill Agreement. Second, it is unconstitutional to unwind the dividend payments without unwinding the transfers to the common stockholders that triggered the payments to Movants.

The unwinding argument is a "strawman," raised by the Movants to be knocked down. The trustee is pursuing fraudulent transfers. He is not required to "unwind" or rescind other transactions, restore the *status quo* or make restitution.

Furthermore, the unwinding claim lacks merit. Even under the Movants' theory, avoiding the dividend payments will place them in the precise legal situation in which they found themselves immediately prior to the payments; they will have the right to unpaid dividends which they can prosecute through the bankruptcy claims allowance process instead of the Delaware court. And had they litigated their rights earlier and received the same dividend payments as the result of a judgment, they would be in the same position that they are now—defending the trustee's action to recover the payments.[15] Finally, if the dividend payments turn out to be fraudulent transfers, the Movants will not have suffered the loss of any rights because

they would not have been entitled to the payments in the first place.

## D. Recoupment

The Movants also argue that they are entitled to recoup their unpaid dividends and unredeemed stock against the trustee's fraudulent transfer claims. The doctrine of recoupment in bankruptcy is narrowly construed. It is limited to situations in which "both debts arise out of *a single integrated transaction* so that it would be *inequitable* for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *Malinowski v. New York State Dep't of Labor (In re Malinowski)*, 156 F.3d 131, 133 (2d Cir.1998) quoting *University Med. Ctr. v. Sullivan (In re University Med. Ctr.)*, 973 F.2d 1065, 1081 (3d Cir.1992). To meet the "same transaction" test, the parties' claims against each other must "result from a set of reciprocal contractual obligations or from the same set of facts." *Id.* at 134.

Because it is an equitable remedy, recoupment is not generally available as a defense to a trustee's fraudulent transfer claim. *See Geron v. Schulman (In re Manshul Constr. Corp.)*, 97 Civ. 8851(JGK), 2000 WL 1228866, at *56–57 (S.D.N.Y. Aug. 30, 2000); *McColley v. Rosenberg (In re Candor Diamond Corp.)*, 76 B.R. 342, 352 n. 12 (Bankr.S.D.N.Y. 1987); *but see In re Integrated Res., Inc.*, 157 B.R. 66, 73 (S.D.N.Y.1993)("Recoupment is permitted based on fraud in the inducement of the very transaction out of which a claimed fraudulent transfer arose"). Had Trace paid the dividend or

---

**15.** The Movants' argument implies that they would be in a different and better legal position now if they had litigated, won and collected earlier. A judgment, however, would not change the underlying nature of the obligation. Furthermore, the doctrine of collateral estoppel would not bar the trustee from demonstrating that he was entitled to recover the sums collected pursuant to the judgment. The trustee in pursuit of an avoidable transfer is not deemed to be in privity with the debtor. *See Gray v. Fill (In re Fill)*, 82 B.R. 200, 217 (Bankr.S.D.N.Y.1987).

redemption claims that the Movants are trying to recoup, those transfers would be recoverable as fraudulent transfers to the same degree as the payments that Trace did make. It is not equitable to allow the Movants to recoup an unpaid fraudulent transfer and thereby legitimize an earlier fraudulent transfer that was actually made.

Furthermore, recoupment does not lie because the offsetting claims arose out of different transactions. The Movants' claims are based on the Standstill Agreement, the *pari passu* clause and the Remedial Order. The trustee's right to recovery does not arise under any of their provisions, but rather, by operation of the fraudulent transfer laws.

## CONCLUSION

For the reasons stated, the Movants' motions for judgment on the pleadings dismissing the claims based on actual fraud and the preference laws are granted, and the balance of their motions are denied. The Court has considered their other arguments not specifically addressed above, and concludes that they lack merit. The parties are directed to contact chambers and arrange for a pretrial conference. Settle separate orders in each adversary proceeding.